## RICHMOND v. BLAKE.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 171.   Argued December 20, 1889.—Decided January 6, 1890.

The plaintiff had a place of business, indicated by a sign over the door, where his mail matter was received, and where he could be met by his clients, and where the latter could deliver to him stocks to be sold by him or under his supervision, and he was engaged there in the business of buying and selling stocks for his customers, in which business he regularly employed capital, by the use of which interest was earned upon moneys advanced by him for his customers; *Held*, that he was a "banker" within the meaning of that term as used in Rev. Stat. § 3407, and subject to taxation as such under the provisions of § 3408.

THE case is stated in the opinion.

*Mr. Henry E. Tremain* (with whom was *Mr. Mason W. Tyler* on the brief) for plaintiff in error.

*Mr. Alphonso Hart*, Solicitor of Internal Revenue (with whom was *Mr. Solicitor General* on the brief) for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was brought to recover certain sums of money paid under protest by the plaintiff in error to the United States in the years 1881, 1882 and 1883, and which he alleged were exacted from him under an illegal assessment made upon capital employed in his business.

If within the meaning of the statutes under which the assess-

ment was made the plaintiff was a banker, and if the capital assessed was employed in the business of banking, the judgment must be affirmed.

By section 3407 of the Revised Statutes of the United States, it is provided that "every incorporated or other bank, and every person, firm or company having a place of business where credits are opened by the deposit or collection of money or currency, subject to be paid or remitted upon .draft, check, or order, or where money is advanced or loaned on stocks, bonds, bullion, bills of exchange or promissory notes or where stocks, bonds, bullion, bills of exchange or promissory notes are received for discount or .for sale, shall be regarded as a bank or a banker." 13 Stat. 251, c. 173 § 79; 14 Stat. 115, c. 184, § 9.

Section 3408 provides that there shall be levied, collected and paid a tax of one twenty-fourth of one per centum each month upon the average amount of the deposits of money, subject to payment by check or draft, or represented by certificates of deposit or otherwise, whether payable on demand or at some future day, with any person, bank, association, company or corporation, engaged in the business of banking; also "a tax of one twenty-fourth of one per centum each month upon the capital of any bank, association, company, corporation, and on the capital employed by any person in the business of banking beyond the average amount invested in United States bonds : *Provided,* That the words 'capital' employed' shall not include money borrowed or received from day to day, in the usual course of business, from any person not a partner of, or interested in the said bank, assoc'ation or firm." 13 Stat. 277, c. 173, § 110; 14 Stat. 137, 146, c. 184, § 9; 17 Stat. 256, c. 315, § 37; 18 Stat. 311, c. 36, § 19.

That the plaintiff, during the period covered by the assessment against him, employed a capital in his business is beyond dispute; for he distinctly states that the capital used by him in his business ranged from $30,000 to $50,000. Upon that basis he made his returns for taxation. But did he, during that period, have a place of business where stocks were received for sale? If he did, then, by the very terms of the

statute, he was a banker under the definition given in section 3407.

It is contended by him that he was only a stock broker, and, within the true meaning of section 3407, did not have " a place of business," nor "receive" stocks for sale. That he had a room or place, indicated by a sign over the door, where his mail matter was received, and where he was, or could be, met by his clients, and where the latter could deliver stocks to be sold by him, or under his supervision, and that he bought and sold stocks for his customers, is abundantly shown by his own testimony.[1]  Still, he insists that when stocks were delivered

---

[1] His testimony occupies many pages of the record. The substance of what he said is shown in the following extracts. On his examination in chief he stated: " My place of business is 33 New Street; during the years 1881 and 1882 and 1883 my business was that of a stock broker; according to my understanding, that is a well-defined avocation; it consisted in buying and selling stocks for customers, and carrying them by borrowing money for customers to carry those stocks on; that occupation was carried on by a great many members of the New York Stock Exchange; there are, some bankers in the Stock Exchange, but the business carried on there, as a rule, is that of stock brokers."

Upon cross-examination he stated: "I have a sign on the door which has been there four or five years. It reads, ' David Richmond, Stock Broker.' If a customer came into my office to buy stock he would give me an order and hand me a margin to protect me against loss for the purchase; then the next day, when the stock was delivered to me, I would borrow money to pay for it. This is a regular purchase; sometimes customers pay in full for stock. We seldom book orders; we buy stock on the stock board, sometimes receiving the margin and sometimes not. We receive certificates purchased on the stock board, as a rule, next day. It is sent to my office by the seller, and he receives a check in payment, drawn on the Leather Manufacturers' Bank against a deposit I keep there; that deposit is, as a rule, my own money. Q. Your capital? A. A portion of it; not always. Q. How much capital did you have in your business at that time? A. I have forgotten; it was nothing like $300.000: it ranged from $30,000 to $50,000. It was on that capital that I made the return for taxation. I had in business that amount. It was on that return that I was taxed one twenty-fourth of one per cent per month, and it is to recover back that tax that this suit is brought. . . . Q. Do you keep an open account with your customers? A. I do. Q. On your ledger? A. Yes. Q. Do you credit him with the amount of the margin which you receive? A. We credit him with the amount; if it is money, he receives credit for it; if it is securities, he receives credit, of course, for that. Q. Do you charge him with the cost

to him at this place of business for sale they were not "received" by him "for sale," within the meaning of the statute. We cannot assent to this view.

---

price of the stock purchased pursuant to his order? A. I do. Q. And do you charge him with the interest on the difference between the cost price of the stocks and the amount of his margin? A. I do. Q. How is your difference settled? A. He receives interest on the amount placed to his credit, and is charged interest on the amount placed to his debit, which is practically the same. You asked me the way in which it is done, I understand? Q. Then, instead of deducting the lesser number from the larger number, and then calculating the interest charge to be made to the customer, you make two calculations, debiting one and crediting the other? A. Exactly so. Q. And that interest is charged against him up to what time? A. No stated time; it depends upon whether the stock is sold or not, or whether it is paid for afterwards by him — taken up. Q. It is charged to him up to the time that he either closes out his account or — A. Settled in full. Q. That may be done either by selling out the stock which you hold or by paying the amount charged against him on your books as the purchase money? A. Yes." "Q. Now, you have described the manner of doing business on orders to purchase; won't you please tell the jury about the manner of doing business when you receive orders to sell? A. Sometimes a customer may write us from the country to sell stock, and then he says he will forward it by mail when sold; another time he may inclose it with the order; another time a customer will come into the office with a certificate and say ' sell this :' another time he may come in and say, ' sell this and I will deliver the certificate to-morrow,' and so on. I sell the stock, and when the time to deliver it to the broker or buyer arrives I deliver it and receive his check for it. If the seller wants the money I give it to him, If he does not want it he may leave the money there over night, or two or three days, but that would be only incidental to the business. It isn't my line of business to receive money in that way; it is an incident of the business. When it is left with me the customer in the country does not make a draft on me; I almost invariably send him my own check. Q. How as to the sale of the stock? A customer comes in with a certificate and asks you to sell it; describe the entire transaction. A. I go up to the board and sell it; I pay him sometimes that day, sometimes the next, but very rarely indeed when he delivers the certificate of stock. I keep the certificate in the office until I go to the board to sell stock; sometimes until the next day; sometimes I borrow money on it over night. I keep it in the drawer, or in the safe, on in the desk; it is paid for with money in the bank to my credit by my personal check. In the case of the country customer who sends an order to sell, stating that he will forward the certificate of stock by mail, or as soon as required, I sell the stock and notify him of the sale; then probably he sends me the certificate. I don't send him the money for that certificate before I receive it. This order to sell would probably be sent to my place of business. In the

In support of this position the plaintiff cites *Warren* v. *Shook*, 91 U. S. 704, and *Selden* v. *Equitable Trust Co.*, 94 U. S. 419. In the first of those cases the question was whether a firm, holding a special license as bankers, was liable to the tax imposed by section 99 of the act of June 30, 1864. 13 Stat. 273. That statute imposed a tax of one twentieth of one per centum upon the par value of stock and bonds sold by "brokers and bankers doing business as brokers." It

case of a ' short sale' it was just the reverse of the purchase business; I sell it, and when the time comes for delivery I borrow the stock of another broker. Q. You tell your broker friend·or business acquaintance that you want to get one hundred shares of Lake Shore, for instance? A. I would tell a friend that I wanted to borrow one hundred shares of Lake Shore, and he says, 'All right; you can have it.' He sends it down to my office in a short time, and I pay him for it; I pay him the market price with money to my credit in the bank; the customer who has ordered the short sale may have sent me money or may not have; he may have given me stock as margin or other security. Q. He is credited on that amount of margin, is he? A. He is when we get it. Q. On your books is he debited with anything? A. He is not. Then he gets a credit for the amount of stock that is sold, the amount of money received for it, and we charge him for whatever is paid for the use of the stock; the general custom is to charge for the use of the stock. Stocks might be running flat; he is credited with the interest on his margin; the transaction might be closed at any time by the purchase of the stock for and on account of the customer. On our books he would be charged with the cost of the stock as bought on the board, with commission. Our letting the account stand would depend altogether on the price the stock was bought at and the price it was sold at. Q. Assuming that there had been an advance in the stock market pending the borrowing and the sale pursuant to the original order, and the purchase made for the purpose of closing the transaction, how would the books stand? A. The customer might have bought stock at another office, and bring it in. You cannot figure on those things, except on the actual facts at the time. Suppose, for instance, the stocks were sold for ninety and bought back at ninety-five, that would show a loss of about $525, on the supposition that nothing was paid for the use of the stock. His margin would then be encroached upon by just the amount of the difference between the original price sold for and the price paid by us on closing it and the commissions and whatever we had to pay for the use of the stock. If, on the contrary, there had been a profit to the customer, we would be in his debt then the amount of the margin deposited and the amount of his profit; we would have that to his credit; almost invariably he would be given a check for it; if he saw fit to make his draft upon us, that could be done, of course, but they did not do it; if he did make his draft I should honor it."

was held that Congress intended to impose the duty prescribed by section 99 upon bankers doing business as brokers, although a person, firm or company, having a license as a banker, might be exempted by subdivision nine of section 79 of the act of 1864, as amended by the act of March 3, 1865, 13 Stat. 472, from paying the special tax imposed upon brokers. Nothing more is decided in that case.

In *Selden* v. *Equitable Trust Co.*, the question was whether corporations whose business was to invest their own capital — not that of others — in bonds secured by mortgage upon real estate, and to negotiate, sell and guarantee such bonds, were banks or bankers within the meaning of section 3407 of the Revised Statutes. It was held that they were not; that Congress did not intend that a person or corporation selling its own property, not that received from other owners for sale, should be classed as a banker or bank for the purposes of taxation. The court, in that case, referred to section 3407 as describing three distinct classes of artificial and natural persons, distinguished by the nature of their business; first, those who have a place of business where credits are opened by the deposit or collection of money or currency, subject to be paid or remitted upon draft, check or order; second, those having a place of business where money is advanced or loaned on stocks, bonds, bullion, bills of exchange or promissory notes; third, those having a place of business where stocks, bonds, bullion, bills of exchange, or promissory notes are received for discount or for sale. In respect to the third class it was said: "The language of the statute is, 'where' such property is 'received' 'for discount or for sale.' The use of the word 'received' is significant. In no proper sense can it be understood that one receives his own stocks and bonds, or bills or notes, for discount or for sale. He receives the bonds, bills, or notes belonging to him as evidences of debt, though he may sell them afterwards. Nobody would understand that to be banking business. But when a corporation or natural person receives from another person, for discount, bills of exchange or promissory notes belonging to that other, he is acting as a banker; and when a customer brings bonds, bullion or stocks

for sale, and they are received for the purpose for which they are brought, that is, to be sold, the case is presented which we think was contemplated by the statute. In common understanding, he who receives goods for sale is one who receives them as agent for a principal who is the owner. He is not one who buys and sells on his own account."

This language embraces the present case. The plaintiff was not a broker who, without employing capital of his own, simply negotiated purchases and sales of stocks for others, receiving only the usual commissions for services of that character. In his business of buying and selling stocks for others, he regularly employed capital, by the use of which interest was earned upon moneys advanced by him for his customers, substantially as it would be earned by a bank upon money loaned to its customers. In the parlance of the Stock Exchange, he might be called a stock broker; yet, here were all the conditions, which, under the statute, made the case of a banker, whose capital, employed in his business, was liable to a tax of one twenty-fourth of one per centum each month. It is not a sufficient answer to this view to say that the business of a stock broker is ordinarily distinct from the business of a banker, or that according to the common understanding a stock broker is not a banker. A stock broker may do some of the kinds of business that are usually done by bankers, and many banks and bankers do business which, as a general rule, is only done by stock brokers. Congress did not intend that the question of taxation upon capital employed in the business of banking, should depend upon the mere name given to such business, either by those engaged in it or by others. When the plaintiff admits, as he does, that his business was that of buying and selling stocks for his customers, and that in such business he employed capital, he proves that he was a banker within the statutory definition, and that, within the meaning of section 3408, his capital was employed in the business of banking. He brings himself within the rule that Congress prescribed for determining who, *for the purposes of the taxation in question* — though not necessarily in the commercial sense — were bankers and what was banking business. That

rule is expressed in words that leave no doubt as to what was the intention of Congress. The judgment below gives effect to that intention, and it is

*Affirmed.*

Mr. JUSTICE FIELD, with whom concurred Mr. JUSTICE MILLER, dissented.