**In re PRUDENCE CO., Inc.**

**No. 27028.**

District Court, E. D. New York.

Feb. 1, 1935.

See, also (D. C.) 10 F. Supp. 41.

Edward Endelman, of New York City, for petitioning creditors.

Archibald Palmer, of New York City, for intervening creditors.

Samuel Silbiger, of Brooklyn, N. Y., for petitioning creditors in involuntary petition in bankruptcy.

Jacob A. Freedman, of Brooklyn, N. Y., and Pollock & Nemerov, of New York City, for intervening creditors in involuntary petition in bankruptcy.

James T. Heenehan, of New York City (Gerald Donovan, of New York City, of counsel), for Superintendent of Banks.

Hornblower, Miller, Miller & Boston, of New York City (Harold H. Corbin, of New York City, of counsel), for Prudence Company, Inc.

Weinstein & Levinson, of New York City, for objecting creditors.

MOSCOWITZ, District Judge.

On October 24, 1934, three creditors of the Prudence Company, Inc., filed a petition for the reorganization of the corporation under section 77B of the Bankruptcy Act (11 USCA § 207). The Superintendent of Banks of the State of New York, who had theretofore taken possession of the property and business of the Prudence Company, Inc., pursuant to the authority vested in him by section 57 of the Banking Law of the State of New York, and three creditors of the debtor, filed answers controverting the material allegations of the petition and moved to dismiss the same for insufficiency and lack of jurisdiction on the part of the court. The decisions upon the issues of fact and questions of law raised by the pleadings and various motions interposed herein were reserved pending the trial.

The question for determination is whether this court has jurisdiction in the premises, i. e., whether the debtor is a corporation which could become a bankrupt under section 4 of the Bankruptcy Act, as amended in 1910 (11 USCA § 22), and therefore subject to reorganization under section 77B.

The Prudence Company, Inc., is an "investment company" incorporated under former article 7, § 290 et seq., entitled "Investment Companies" (now article 12-A, § 505 et seq.), of the Banking Law of the State of New York, being chapter 369 of the Laws of 1914. It could not transact business (other than organization) until authorized by the certificate of the Superintendent of Banks (section 506). It was required to make a deposit of securities "as a pledge of good faith and as a guaranty of compliance with the provisions of this chapter" (section 507), and it was required to make annual reports to the Superintendent of Banks, and penalized for failure to do so (section 513). There are other provisions regulating the conduct of the business of investment companies as well as the procedure for the supervision and liquidation of such companies (sections 57–83).

Under section 508 of the Banking Law, an investment company in addition to the powers conferred by the general and stock corporation laws of the state of New York may, subject to the restrictions and limitations contained in article 12-A, have the following powers:

"1. To sell, offer for sale or negotiate bonds or notes secured by deed of trust or mortgages on real property situated in this state or outside of this state, or choses in action owned, issued, negotiated or guaranteed by it; to advance money upon the security of such bonds, notes or choses in action; to purchase or otherwise acquire such bonds, notes or choses in action and to pledge them to secure the payment of collateral trust bonds or notes; to sell or otherwise negotiate such collateral trust bonds or notes, provided, however, that the grant of powers which an investment company may exercise pursuant to this subdivision one shall not be deemed to affect the right of a corporation now or hereafter organized pursuant to the provisions of any other statute to exercise similar powers; or to prevent the organization under the

stock corporation law of a corporation for such purposes.

"1-a. To accept bills of exchange or drafts drawn upon it payable on demand or on time not exceeding one year from the date of acceptance; to issue letters of credit authorizing the holders thereof to draw drafts upon it at sight or on time not exceeding one year from the date of any such letter of credit; to discount, purchase or advance money on the security of bills of exchange, drafts, notes, acceptances, or other choses in action; to buy and sell coin, bullion and exchange; to issue, at any branch office authorized by the superintendent of banks pursuant to section fifty-one of this chapter and established in a country or province of Asia in which the principal local currency consists of silver coin or bullion, notes payable in the local currency to bearer on demand without interest; provided, however, that the total amount of such notes issued by any such investment company and outstanding at any one time shall not exceed twice the paid-in capital of such investment company and that there shall be kept on hand at each branch office where such notes are issued a reserve in silver bullion or in the local silver coin of at least fifty per centum of the notes so issued at such branch office.

"2. To receive money or property in instalments or otherwise from any person or persons, with or without an allowance of interest upon such instalments; to enter into any contract or undertaking with such persons for the withdrawal of such money or property, at any time, with any increase thereof, or for the payment to them or to any person of any sum of money at any time, either fixed or uncertain.

"3. To engage in the business of receiving deposits, provided that it shall not engage in such business in this state until it shall have first made such deposit of securities with the superintendent of banks as is required of trust companies by section one hundred and eighty-four of this chapter.

"4. To establish branches pursuant to section fifty-one of this chapter.

"5. To purchase, acquire, invest in and hold all or any of the stocks of any corporation, domestic or foreign, and to sell and dispose of all or any such stocks owned by it; provided, however, that the grant of powers which an investment company may exercise pursuant to this subdivision shall not be deemed to affect the right of a domestic corporation now or hereafter organized pursuant to the provisions of any other statute to exercise similar powers, nor to constitute 'the business of an investment company or any part thereof' within the meaning of section five hundred nineteen of this chapter, and further provided, that any such investment company shall not invest and keep invested an amount in excess of ten per centum of the capital and surplus of such investment company in any one moneyed corporation, nor an amount in all moneyed corporations in excess of thirty per centum of the capital and surplus of such investment company."

Section 509 contains restrictions upon the powers of investment companies, and subdivision 1 thereof reads as follows: "An investment company shall not: 1. Exercise the powers conferred by subdivision one-a of section five hundred and eight of this chapter, unless it shall have a paid-up capital stock of at least two million dollars; exercise, within this state, the powers conferred by both subdivisions one-a and three of section five hundred and eight of this chapter."

A further restriction is set forth in section 505, subd. 3 thereof, and in so far as the same is material states: "Neither preferred nor common stock shall be issued at less than the par value of such stock and the aggregate par value of the common stock issued and outstanding shall at least equal the aggregate par value of the preferred stock issued and outstanding, and the par value of the preferred stock shall be not less than five million dollars, provided, however, that no preferred stock shall be issued by an investment company exercising the powers conferred by subdivision three of section five hundred and eight of this article and no investment company having preferred stock issued and outstanding shall exercise said powers."

The Superintendent of Banks urges that section 508, subd. 3, supra, clearly indicates that the debtor is a banking corporation, because of the alleged grant of power therein to "engage in the business of receiving deposits. * * *" The remaining provision of this subdivision requiring that "it shall have first made such deposit of securities with the superintendent of banks as is required of trust companies by section one hundred and eighty-four of this chapter" is construed by the superintendent to be a limitation upon the exercise of

the power to "engage in the business of receiving deposits."

The relief afforded by section 77B of the Bankruptcy Act (11 USCA § 207) may be availed of by or against any corporation which could become a bankrupt under section 4 of the Bankruptcy Act of 1898, 30 Stat. 547, as amended by the Act of June 25, 1910, 36 Stat. 839 (11 USCA § 22). This section specifically excepts from voluntary or involuntary bankruptcy "banking" or "insurance" corporations, among others. Other "moneyed," "business," or "commercial" corporations are amenable to bankruptcy. It is the contention of the Superintendent of Banks that the debtor is a banking corporation within the purview of section 4 of the Bankruptcy Act, as amended, and therefore not subject to reorganization proceedings under section 77B.

While it is true that the meaning of the word "bank" or "banking" as used in the statutes and cases will depend to a greater or lesser extent upon the context in which it is used, it seems profitable to inquire into judicial interpretations of the quoted words outside the field of bankruptcy as well as in bankruptcy cases. Warrant for such an inquiry is found in the fact that cases under section 4b, as amended (11 USCA § 22 (b), refer to authorities outside the immediate bankruptcy field. See, e. g., State of Kansas v. Hayes (C. C. A. 10) 62 F.(2d) 597; Gamble v. Daniel (C. C. A. 8) 39 F.(2d) 447.

■ The functions of banks, by which they may be exhaustively defined, are conceived as embracing three types of activity: (1) Deposit; (2) discount or loan; (3) issuance of circulating notes (bank notes). As stated in 7 Corpus Juris, 473, 474: " * * * perhaps the most concise and at the same time complete definition to be found in the books is that a bank is 'an association or corporation whose business it is to receive money on deposit, cash checks or drafts, discount commercial paper, make loans, and issue promissory notes payable to the bearer, called banknotes.' "

The Supreme Court has apparently approved and subscribed to this general definition, for in Mercantile National Bank v. Mayor of City of New York, 121 U. S. 138, 7 S. Ct. 826, 835, 30 L. Ed. 895, 902, a case involving alleged discriminating taxation of national banks, the court stated: " * * * The business of banking, as defined by law and custom, consists in the issue of notes payable on demand, intended to circulate as money where the banks are banks of issue; in receiving deposits payable on demand; in discounting commercial paper; making loans of money on collateral security; buying and selling bills of exchange; negotiating loans, and dealing in negotiable securities issued by the government, state and national, and municipal and other corporations." See, also, Auten v. United States National Bank of New York, 174 U. S. 125, 126, 19 S. Ct. 628, 43 L. Ed. 920; Warren v. Shook, 91 U. S. 704, 23 L. Ed. 421; Oulton v. German Savings & Loan Society, 17 Wall. (84 U. S.) 109, 21 L. Ed. 618; Lionberger v. Rowse, 9 Wall. 468, 19 L. Ed. 721.

■ From the evidence adduced at the trial it appears that the debtor herein never performed the banking functions of receiving deposits and issuing banknotes during its corporate existence; factually, therefore, it was not a bank of deposit or a bank of issue. In so far as it may have been the owner of collaterals including real estate, against which it has placed mortgages or trust deeds, marketing such mortgages to the public in shares, it clearly did not do a banking business. The question arises whether it may be deemed a bank in so far as it (1) loans money on real property, such loans being evidenced by the bonds of third parties secured by mortgages, assigns the bonds and mortgages to a trustee, receiving in consideration therefor bonds and participation certificates, and then markets these securities to the public together with its own guaranty; and (2) loans money on real property, such loan being evidenced by a bond secured by a mortgage, and sells such bond and mortgage as a whole together with its own guaranty.

The Supreme Court has unequivocally held that the functions described above do not constitute banking in any sense. The question was almost squarely raised in Selden v. Equitable Trust Company, 94 U. S. 419, 420, 24 L. Ed. 249. The Trust Company therein claimed that it fell for tax purposes within the existing statute which defined a "banker" as follows: " * * * having a place of business where credits are opened by the deposit or collection of money or currency, subject to be paid, or remitted upon draft, check, or order, or where money is advanced or loaned on stocks, bonds, bullion, bills of exchange, or promissory notes, or where stocks, bonds, bullion, bills of exchange, or promissory

notes are received for discount or for sale. * * * "

In Warren v. Shook, supra, this statute was said to furnish a satisfactory definition of the business of a banker. The business of the Trust Company in the Selden Case, supra, was described as "the investing of its own capital in mortgage securities on real estate, and selling such mortgage securities with the company's guaranty." This also constituted the principal business of the debtor herein. After summarily dismissing the contention that the Trust Company was a bank of deposit, the court addressed itself to the argument that it was engaged in the business of advancing money on bonds. The argument was found untenable, the court holding that the Trust Company advanced money on the security of the real estate mortgaged and not on the security of the obligor's bond. The statute was intended to cover the case of pledges of bonds in which the taxpayer was pledgee. Lending on real estate is not a banking function, unless perhaps when combined with the receipt of deposits, the deposits being used for loans on real estate. But the trust company did not "receive" bonds "for discount or sale." One cannot be deemed to "receive" bonds of which one is the obligee. That branch of the statute was intended to cover the case of discounting or selling bonds owned by third parties. The authority of the Selden Case was affirmed in Richmond v. Blake, 132 U. S. 592, 597, 10 S. Ct. 204, 33 L. Ed. 481.

In Middlesex Banking Co. v. Eaton (C. C. A. 2) 233 F. 87, a tax statute gave an exemption to "banks" to the extent of interest paid or money deposited, and the question was whether the Middlesex Company was a bank. During the taxable years in question the company sold its own obligations (debenture bonds) secured by mortgages on real property deposited with a trustee; and sold also the obligations of third parties, secured by mortgages, running to the company, accompanied by its own interest coupons for a lesser amount than was stipulated in the bonds. The company guaranteed the bonds as to principal and interest. Following the authority of the Selden Case, supra, the court held that neither transaction was a banking operation, and as almost the entire business of the taxpayer was of this character it was not a bank.

From the testimony herein it appears that the debtor received bonds and mortgages as security for loans on real property, and assigned said bonds and mortgages to third parties together with its guaranties of principal and interest, or assigned them to Prudence Bonds Corporation, which immediately reassigned the same to trustees or depositaries pledging the bonds and mortgages, as collateral, for issues of participating certificates or bonds. The debtor marketed these latter securities to the public, guaranteed them as to principal and interest, and retained the differential between the interest stipulated in the bonds and mortgages (usually at the rate of 6·per cent.) and the rate guaranteed (which was usually 5½ per cent.). This, however, does not constitute banking (Selden v. Equitable Trust Co., supra), and inasmuch as this constituted the debtor's major activity, if not its entire activity, it must be held as a matter of fact that the debtor did not engage in a banking business.

However, the Superintendent of Banks claims that by virtue of the debtor's incorporation under the Banking Laws of the State of New York and the alleged grant of banking powers thereunder, the debtor is a "banking" corporation within the exemption of section 4b of the Bankruptcy Act, as amended, and therefore not amenable thereto.

This contention raises the following questions: (1) What is a banking corporation within the meaning of the Bankruptcy Act; and (2) is the determination of whether an institution is a banking corporation dependent solely upon the powers contained in the corporate charter, or may an examination be made of the actual business conducted? In resolving these questions it must be borne in mind that the Bankruptcy Act which renders certain corporations exempt therefrom must be strictly construed, and corporations claiming such exempt status must clearly come within the description used. In re Bay Cities Guaranty Building-Loan Ass'n (D. C.) 48 F.(2d) 623.

The decisions concerned with the construction of the word "bank" for purposes of exemption under the Bankruptcy Act have held that an indispensable element of a banking corporation is the receipt of deposits for use in business subject to repayment to depositors. Gamble v. Daniel (C. C. A. 8) 39 F.(2d) 447, 451; In re Bay Cities Guaranty Building-Loan Ass'n (D. C.) 48 F.(2d) 623; State of Kansas v.

Hayes (C. C. A. 10) 62 F.(2d) 597; Clemons v. Liberty Savings & Real Estate Corp. (C. C. A. 5) 61 F.(2d) 448.

In Gamble v. Daniel, supra, a trust company organized under the laws of Nebraska was taken over for liquidation by the Department of Trade and Commerce of the State of Nebraska, the statutory agency of the state in charge of banks and insurance companies. A petition in bankruptcy was subsequently filed by creditors. The question presented was whether this trust company was a banking corporation and therefore exempt from bankruptcy. While the company possessed most of the powers usually exercised by a bank, it was forbidden to receive deposits. It was contended by those challenging the jurisdiction of the federal court that banking business within the act meant the doing of any one of the essential or usual things done by a bank —such as discounting commercial paper, making loans, buying and selling commercial paper—and that inasmuch as the trust company under consideration was authorized to do several of these acts it was not amenable to bankruptcy. The court, however, took the position that the receipt of deposits was a necessary sine qua non, and since no such power existed, the institution was amenable to bankruptcy. The court stated that, "while there may be other attributes which a bank may possess, yet a necessary one is the receipt of deposits which it may use in its business." Examining the language of the act in the light of the congressional intent and the prevailing conception of banking institutions, the court declared: "When Congress spoke of 'banking corporations' it spoke as of 1910. It used the words in no technical nor special sense, but as they were then ordinarily understood. At that time, the ordinary conception of a bank was of a business which was based primarily on the receipt of deposits (general or special), which deposits were used by the bank for loans, discounts, buying and selling commercial paper, and other business purposes. None but national banks could then issue bank notes as currency. The prime incentive in engaging in the business was the profit to be made, directly or indirectly, from use of deposits. Most of the then existing state legislation concerning banks had as its principal purpose the protection of such depositors. Much of the right to regulate banks was the public interest in protecting depositors. Banking has been a de-velopment, and the above was its status in 1910. Other businesses might and did, and still do, deal in commercial paper, make loans or borrow money without any one thinking of them as banks. When a business takes deposits and then does the above or related things, every one knows it is doing a banking business. As far back as Oulton v. German Sav. & L. Soc., 17 Wall. 109, 118, 21 L. Ed. 618, it was said: 'Strictly speaking the term bank implies a place for the deposit of money, as that is the most obvious purpose of such an institution.' Also see further discussion in that opinion (page 119 of 17 Wall., 21 L. Ed. 618) where deposits are emphasized and, also, Bank for Savings v. Collector, 3 Wall. 495, 512, 18 L. Ed. 207. Also see Auten v. U. S. Nat. Bank, 174 U. S. 125, at pages 141 and 142, 19 S. Ct. 628, 43 L. Ed. 920; Morse on Banks and Banking (6th Ed.) §§ 2 and 3. It is also suggestive that the amendment of 1874 (18 Stat. 178, 180) to section 39 of the act of 1867 (under which bankers were subject to bankruptcy) added as an act of bankruptcy 'who, being a bank or banker, shall fail for forty days to pay any depositor upon demand of payment lawfully made' (page 181)."

And in the case of In re Bay Cities Guaranty Building-Loan Ass'n, supra, a building and loan association, organized for the purpose of investing or lending the money of certificate or shareholders, was prohibited from carrying on its books any demand, commercial, or checking accounts, and prior to the amendment which exempts building and loan associations from bankruptcy (Bankr. Act § 4b, as amended in 1932, 47 Stat. 47, 11 USCA § 22 (b), an effort was made to declare this company a bankrupt. The court, subscribing to Gamble v. Daniel, supra, held that the determining characteristic of a banking corporation, exempting it from involuntary bankruptcy, was the receipt of deposits. Absent this element, the company was not a bank and could be adjudicated a bankrupt.

The Superintendent of Banks asserts that the debtor herein was empowered to engage in the business of receiving deposits under section 508, subd. 3, of the Banking Law, supra, and therefore this court must find that the statutory grant of such power, ipso facto, constitutes the debtor a banking corporation within the meaning of section 4b of the Bankruptcy Act, as amended. It is claimed, in effect, that the actual

business done by the debtor has no bearing upon its status for bankruptcy purposes.

Upon the trial herein it was conceded by the Superintendent of Banks that the debtor never made the deposit of securities required by section 508, subd. 3, supra; accordingly it could not lawfully engage in the business of receiving deposits. It was also conceded that in the year 1926 the debtor issued preferred stock in the amount of $5,000,000, and this stock is still outstanding. This likewise precluded the debtor from lawfully receiving deposits. Whether or not these factors have any bearing upon the existence of the power of the debtor to receive deposits is unnecessary to determine. Even were the power conferred without restriction, the court is of the opinion that this debtor could not be held to be a banking corporation under section 4b of the act, as amended, in view of the fact that it never actually engaged in a banking business.

■ It is important here to note that the debtor was plainly empowered to engage in nonbanking functions under section 508, subd. 1, of the Banking Law, supra. From the evidence adduced upon the trial, it appears that the debtor's sole activities were confined to the lending of money on real estate security, selling (with guaranties) the bonds and mortgages given by the borrowers, and using the money so received from purchasers to make additional loans similarly secured. The amount of loans which the debtor made in this manner since its inception was $284,034,144.48. This undoubtedly constituted an investment business. (At this point it may be well to state that if the guaranties contained in the bonds and participation certificates were in legal effect contracts of insurance [Bowers v. Lawyers' Mortgage Co., 285 U. S. 182, 52 S. Ct. 350, 76 L. Ed. 690], from the proof presented herein the element of guaranty involved in its transactions was not sufficient to constitute the debtor an insurance corporation. The debtor never held itself out to be an insurance company, and prior to the filing of the petition herein, no claim was ever made that it had done an insurance business.)

Even if it were assumed that the debtor herein was empowered to do a banking as well as a nonbanking business, but never actually engaged in a business of a banking nature, can it be said, under these circumstances, that the debtor is a banking corporation solely because it was given the power to engage in banking functions?

■ It may reasonably be inferred that when Congress exempted banking corporations from the operation of the Bankruptcy Act, it did so because of the quasi public nature of the business, involving interests other than those of creditors, and the inappropriateness of the bankruptcy machinery to their affairs. With these considerations in mind, it is manifest that there cannot be a practical application of the exemption to a given corporation if its actual activity is ignored. It need not be determined here, however, when the charter of a corporation alone suffices to determine its status under the Bankruptcy Act. It is enough for present purposes to state that when a corporation is empowered to do a nonbanking and banking business, the court can only determine the corporation's true nature for bankruptcy purposes by inquiring into the actual business which it conducted and if it appears that the corporation engaged only in activities of a general business nature under its nonbanking powers, it must be held to be not exempt from the operation of the Bankruptcy Act.

The authorities do not sustain the superintendent's contention that a corporation's activities may never be examined to determine its classification under the act. Gamble v. Daniel, supra, did not hold that under all circumstances the status of a corporation is to be determined solely by the powers conferred upon it. Indeed, the court specifically stated [page 450 of 39 F.(2d)]: "Whether a corporation empowered to do a banking business and also other character of business, but actually doing no banking business, is included, we need not determine, as that situation is not here present."

And as far back as In re Supreme Lodge of Masons Annuity (D. C.) 286 F. 180, the question whether the nature of a corporation is to be determined by its charter powers, or by the business actually done, or by both, was answered in the following language, which may be adopted as the law of this case (page 183 of 286 F.):

"The second question is answered by considering the very nature of a corporation as a creature whose functions and powers arise out of and are limited by its charter. Manifestly that instrument is the natural primary and generally sufficient evidence of the nature of the corporation,

which ought to be presumed to do what it was chartered to do. The abandonment by the amendment of 1910 of the business principally engaged in which was the test under the original Bankruptcy Act, indicates that it ought no longer to be looked to in ordinary cases. But a corporation often has power to do many things. The most ancient railroad charter in Georgia which is still used is that of the Georgia Railroad & Banking Company, which gave franchises both as a railroad and as a bank. The company has done no banking business for many years, and its present assets and liabilities are only those of a railroad company. Manifestly, if for bankruptcy purposes it were necessary to determine whether it is a railroad or a banking corporation, it should be held to be the former. So many corporations are chartered both as banks and trust companies. Surely whether such a one was actually doing a banking business could be inquired into, if it was sought to be put in bankruptcy. It is even conceivable that a corporation might be chartered to do every lawful business. Then, of necessity, the business it actually did in making its debts and getting its property must be looked to, in order to test its real nature for bankruptcy purposes. * * *

"The true rule is that the charter is first to be looked to, in classifying the corporation, but that the business really done, and which is to be administered in bankruptcy, may also be looked to either to explain or rebut the inferences from the charter powers."

Significant, too, is the case of State of Kansas v. Hayes (C. C. A.) 62 F.(2d) 597, and the recent decision of the Circuit Court of Appeals for the Fifth Circuit, in Woolsey et al. v. Security Trust Co. et al., 74 F.(2d) 334, 335, decided December 12, 1934. In the former case, a trust company empowered by the laws of its creation "to receive deposits subject to check" was sought to be put in bankruptcy. The court declared [page 598 of 62 F.(2d)]:

" * * * The trust company involved in this case had on deposit on demand in March of this year, subject to check, moneys of the state, the city of Topeka, and Shawnee county, in amount $491,704.75; and in bank deposits, savings bank deposits, etc., a total of a very large amount, which was deposited on checking account. In short, the very great amount of the business transacted by the trust company in this case was of that nature transacted by banking corporations. * * *

"It must be held the trust company in question is a banking corporation within the contemplation of the law making power of this state, and also in actual operation and effect * * * and hence is by the operation of the National Bankruptcy Act, exempt from, and not subject to, the operation of that act."

And in Woolsey et al. v. Security Trust Company et al., supra, a corporation clearly empowered to receive deposits under the state statute sought to be declared exempt from the act. The following arguments were propounded to the court: " * * *. Appellees argue that the purposes for which a company is incorporated, as shown by its charter, determine its nature, and that particularly is this so of a banking corporation, subject, as such corporation is, to complete state supervision and control. They argue further that, if what a corporation does, rather than what it was chartered to do, determines in a proceeding of this kind whether it was a banking corporation, the undisputed evidence on that point establishes that it was such a corporation." The court did not directly answer these contentions. It is to be noted, none the less, that after it had been plainly brought out that the trust company therein involved was given the power to engage in a banking business, the court's opinion was devoted to a detailed analysis of the business actually done. It was found that the company had done an extensive deposit business and it was accordingly adjudged exempt from the act. It cannot be assumed, in the face of the arguments squarely presented to the court, that the actual activities of the corporation were not considered an important, if not controlling, element in the determination of the case.

And in the recent cases, the courts in order to determine whether a company was an insurance company for bankruptcy purposes, carefully analyzed the business engaged in and predicated its decisions upon what, in effect, was the major activity of the corporations involved. See In the Matter of Union Guarantee & Mortgage Co. (U. S. D. C., Southern District of New York) 8 F. Supp. 281 (opinion by Patterson, D. J., August 27, 1934); In the Matter of New York Title & Mortgage Company (U. S. D. C., Northern District of New York) 9 F. Supp. 319 (opinion by Cooper, J., December 1, 1934). Clearly no

valid reason can be presented to support the view that different tests should apply in determining whether a corporation is an "insurance" corporation or a "banking" corporation under section 4b.

The Superintendent of Banks has on past occasions recommended to the Legislature of the State of New York that investment companies, such as the debtor corporation herein, be excluded from organization under the Banking Law and that provision be made whereby such corporation can operate under the general business laws of the state inasmuch as they are engaged in the exercise of powers of a general business nature.

In the Superintendent of Banks' annual report to the Legislature for the year ending December 31, 1931 (Legislative Document, 1932, No. 24, p. 16), he stated: "The business of certain types of corporations organized pursuant to the Investment section is of such a nature that it is impossible of examination and supervision by this Department. These corporations do not engage in a general deposit business but instead are engaged in the exercise of powers of a general business nature. In most of our states, corporations of this type are organized under the general business laws and we recommend that provision be made to exclude these corporations from the supervision of the Banking Department and that provision be made whereby they will be able to continue to operate under the general business laws of the State."

And in his report for the year ending December 31, 1932 (Legislative Document, 1933, No. 24, pp. 11, 12), he further stated: "In previous years, we have recommended that the law be amended to exclude from the supervision of the Banking Department the bond and mortgage companies and finance companies which are now operating pursuant to the Investment Article of the Banking Law. Neither of these types of corporations engages in the business of accepting deposits and since in any event their business is of such a nature as to be impossible of supervision by the Department, provision should be made whereby they may be authorized to continue their operations under the General Business Laws. In the past years, we have unsuccessfully sought to have the law amended for this purpose. Legislation will be recommended at this session to permit corporations of this character to re-incorporate under the General Business Laws."

These declarations do not support the contention of counsel for the superintendent that the Banking Department of the State of New York has always considered the debtor herein a banking corporation. It is clear, however, that even if the state through legislative enactment declared the debtor a "banking" corporation exempt from the Bankruptcy Act, this could have no controlling force in the determination of its status under the act. State classification was not regarded, not intended to be followed, for the language of the federal statute used to define the subject of bankruptcy speaks to the entire territory over which Congress has legislative jurisdiction, and means the same thing everywhere. That which is a bank within the meaning of Congress is such in every state, regardless of the name locally assumed by or attributed to it; e converso, that which is not a bank within the meaning of Congress cannot be made such by local classification. In re Supreme Lodge of Masons Annuity (D. C.) 286 F. 180.

In view of all the foregoing, it must be held that the debtor herein is not a "banking" corporation within the purview of section 4b of the Bankruptcy Act, as amended, and accordingly the motion addressed to the court's jurisdiction is denied.