BOWERS, EXECUTOR, *v.* LAWYERS MORTGAGE CO.

No. 355.  Argued January 18, 19, 1932.—Decided March 14, 1932.

*Mr. Claude R. Branch,* with whom *Solicitor General Thacher, Assistant Attorney General Youngquist,* and *Messrs. J. Louis Monarch, J. P. Jackson, Francis H. Horan, Clarence M. Charest, E. H. Horton,* and *Walter W. Mahon* were on the brief, for petitioner.

*Mr. Harry W. Forbes,* with whom *Mr. John A. Garver* was on the brief, for respondent.

Mr. Justice Butler delivered the opinion of the Court.

Respondent voluntarily paid the capital stock tax imposed on domestic corporations by § 1000, Revenue Act of 1921, 42 Stat. 294, for the fiscal years ending June 30 in 1922 and 1923. Thereafter it applied for refund on the ground that it was an insurance company taxable only under § 246, 42 Stat. 262. The claim was denied. It brought this action in the federal court for the southern district of New York to recover the amount so paid. The parties by written stipulation waived a jury and submitted the case on an agreed statement of facts. The district court gave judgment for respondent. 34 F. (2d) 504. The Circuit Court of Appeals affirmed. 50 F. (2d) 104.

The question is whether on the admitted facts respondent was an insurance company subject to the tax imposed by § 246 and therefore not taxable under §§ 230 and 1000.

Respondent was incorporated in 1893 under §170 (1) of Article V of the Insurance Law of New York[1] as the " Lawyers Mortgage Insurance Company " to examine titles, procure and furnish information in relation thereto and guarantee or insure bonds and mortgages and the owners of real estate against loss by reason of defective titles. In 1903, " insurance " was dropped from its name. In 1905, its certificate of incorporation was amended to include the making, and guarantee of the correctness, of searches for instruments, liens and charges affecting real estate and the guarantee of payment of bonds and mortgages.[2] In 1913,[3] the certificate of incorporation was further amended to include authority to insure payment of notes of individuals and partnerships and bonds and other evidences of indebtedness of corporations, when se-

---

[1] Laws 1890, c. 690.

[2] Laws 1904, c. 543.

[3] Laws 1913, c. 215. And see Laws 1911, c. 525.

cured by real 'estate mortgages, and to " invest in, pur-
chase and sell, with such guarantee [of payment] or with
guarantee only against loss by reason of defective title
or incumbrances, bonds and mortgages, and notes of in-
dividuals or partnerships secured by mortgages . . .
and bonds, notes, debentures and other evidences of
indebtedness of solvent corporations secured by deed
of trust or mortgages  . . ." It was subject to super-
vision by the state superintendent of insurance and to the
laws applicable to title and credit guaranty corporations
and was required to file with such superintendent state-
ments of its condition at the end of each year.

Respondent never has insured titles.  In the tax years,
it carried on business as follows: Upon receiving an ap-
plication 'for a loan it caused an appraisal of the proposed
real estate security to be made and procured a title in-
surance company to survey the property, make a report
as to title and insure the same.  The borrower, having
executed and delivered a bond and mortgage to respond-
ent, received from it the amount specified therein less
charges for title insurance, survey, disbursements and re-
cording tax and less a lending fee which included the
charge for appraisal.  Respondent sold the mortgage loans.
On the sale of a bond and mortgage as a whole, it delivered
an assignable contract called " policy of mortgage guar-
antee " to the purchaser.  On the sale of part of a loan,
it issued a participation certificate assignable by indorse-
ment and registration on respondent's books and contain-
ing substantially the same provisions as the policy.  By
every such policy or certificate the purchaser appointed
respondent his agent to collect the principal and interest,
and the latter agreed to keep the title guaranteed and
the premises insured against fire and to require the owner
to pay taxes, assessments, water rates and fire insurance
premiums.  Respondent guaranteed payment of princi-
pal, as and when collected but in any event within 18
months following written demand made after maturity,

and payment of interest regularly at an agreed rate usually one-half of one per cent. less than that specified in the bond. Respondent kept the difference and called it "premium." Respondent also retained the interest accruing between the making of the loans and the sale of the securities. For renewals of loans it charged extension fees.

It issued some policies of guaranty as to mortgage loans which were not made or sold by it. While substantial in amount, that part of its business constituted but a small percentage of the total. It made no assignment or apportionment of assets to the different parts of its business, but used them indiscriminately in its different activities. It kept on hand sufficient bonds and mortgages to maintain the guaranty fund required by the Insurance Law. Corporations organized under the New York banking laws and subject to its banking department are authorized to make loans and sell bonds, mortgages and participations therein with their guaranties under the same general method of doing business as that of respondent. And at least two companies so organized and supervised are carrying on that business.

Pertinent provisions of the Act are printed in the margin.[4] The general rule declared by § 1000 (a) is broad

---

[4] "Sec. 1000 (a). . . . (1) Every domestic corporation shall pay annually a special excise . . . equivalent to $1 for each $1,000 of . . . its capital stock . . .

"(b) The taxes imposed by this section shall not apply . . . to any insurance company subject to the tax imposed by section . . . 246.

"Sec. 246 (a). That, in lieu of the taxes imposed by sections 230 and 1000, there shall be levied, collected and paid . . . upon the net income of every insurance company (other than a life or mutual insurance company) a tax as follows:

"(1) In the case of such a domestic insurance company the same percentage of its net income as is imposed upon other corporations by section 230; . . .

"(b) . . . (1) The term 'gross income' means the combined gross amount, earned during the taxable year, from investment income

enough to include respondent. But, if it was an insurance company taxable under § 246, it was excepted from the general rule by subsection (b). As such corporations constitute a special class, respondent must be held liable for the capital stock tax unless clearly shown to have been an insurance company within the meaning of the Act. *Bank of Commerce* v. *Tennessee,* 161 U. S. 134, 146. *Heiner* v. *Colonial Trust Co.,* 275 U. S. 232, 235. *Choteau* v. *Burnet,* 283 U. S. 691, 696. The Act does not define " insurance company " or definitely indicate criteria by which corporations meant to be so specially dealt with may with certainty be identified. General definition is not necessary in order to determine whether, having regard to the purpose of the classification and the considerations on which it probably was made, respondent's business brought it within the special class.

Under § 230, Revenue Act of 1918, 40 Stat. 1075, insurance companies were taxed as were other business corporations. The applicable definition of gross income was comprehensive and included gains, profits and income derived from any source whatever. § 213, p. 1065. It was substantially the same in the 1921 Act. § 213, 42 Stat. 237. But § 246 of the latter Act dealt with certain classes of insurance companies separately and defined

and from underwriting income as provided in this subdivision, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Convention of Insurance Commissioners;

"(2) The term 'net income' means the gross income as defined in paragraph (1) of this subdivision less the deductions allowed by section 247;

"(3) The term 'investment income' means the gross amount of income earned during the taxable year from interest, dividends and rents . . .

"(4) The term 'underwriting income' means the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred; . . ."

gross income to be "investment income," *i. e.*, interest, dividends and rents, and "underwriting income," *i. e.*, premiums earned less losses and expenses. Capital gains and income from other sources were omitted.

A statement showing respondent's lending fees, extension fees, interest and premiums follows:

| Year | Lending Fees | Extension Fees | Interest | Premiums[5] |
|------|-------------|----------------|----------|-------------|
| 1922 | $655,283.70 | $214,303.56 | $372,795.12 | $619,986.38 |
| 1923 | 990,855.37 | 73,745.71 | 426,842.31 | 750,803.21 |

While name, charter powers, and subjection to state insurance laws have significance as to the business which a corporation is authorized and intends to carry on, the character of the business actually done in the tax years determines whether it was taxable as an insurance company. *United States* v. *Phellis*, 257 U. S. 156, 168. *Weiss* v. *Stearn*, 265 U. S. 242, 254. Evidently that was the basis of the classification. Congress did not intend to exempt from the capital stock tax under § 1000 (a) and the income tax under § 230 corporations not doing insurance business even though organized under and subject to state insurance laws.

The dropping of "insurance" from respondent's name and the extension of charter powers to the purchase and sale of mortgage loans suggest purpose to carry on an investment rather than an insurance business. Respondent did not consider itself an insurance company taxable under § 246 until after it had twice made and paid capital stock taxes under § 1000(a) and income taxes under § 230. The lending of money on real-estate security, the sale of bonds and mortgages given by borrowers and use of the money received from purchasers to make addi-

---

[5] These amounts are derived from interest collected by respondent from borrowers in excess of the rates payable to purchasers under the contract of sale and from charges on policies covering mortgage loans not made or sold by it.

tional loans similarly secured constituted its principal business. Undoubtedly the guaranties contained in the policies and participation certificates were in legal effect contracts of insurance. *Tebbets* v. *Mercantile Credit Guarantee Co.,* 73 Fed. 95, 97. *Guarantee Co.* v. *Mechanics' Bank & Trust Co.,* 80 Fed. 766, 772. *State ex rel. Peach Co.* v. *Bonding & Surety Co.,* 279 Mo. 535, 553, 556; 215 S. W. 20. *People* v. *Potts,* 264 Ill. 522, 527; 106 N. E. 524. *People* v. *Rose,* 174 Ill. 310; 51 N. E. 246. *Commonwealth* v. *Wetherbee,* 105 Mass. 149, 160. *Shakman* v. *United States Credit System Co.,* 92 Wis. 366, 374; 66 N. W. 528. *Young* v. *American Bonding Co.,* 228 Pa. 373, 380; 77 Atl. 623. These guaranties furnished purchasers additional security and were calculated to make the loans desirable as investments and readily saleable at a profit.

The lending fees, extension fees and accrued interest appertain to the business of lending money rather than to insurance, and may not reasonably be attributed to the subordinate element of guaranty in respondent's mortgage loan business. The so-called premiums amount to about one-third of total income, but they cover agency and other services which generally are not performed under contracts of insurance. There is no showing that these amounts do not include profits arising from such sales or that they are justly chargeable or were intended to apply only to the risks covered. Respondent has not established any basis upon which the interest so retained may reasonably be charged or apportioned to the element of insurance involved in such transactions. And the stipulation in respect of policies issued on loans not made by respondent is too vague to be given weight.

" Premiums " are characteristic of the business of insurance, and the creation of " investment income " is generally, if not necessarily, essential to it. Section 246 does not cover any other class of income. It is not shown that

respondent had any investment income within that section. Evidently its guaranties produced less than one-third of its income.

Respondent's business is one which may be and is in fact carried on by corporations organized under the New York banking laws. The element of insurance may not properly be regarded as more than an incident thereof; it certainly is not sufficient to make respondent an " insurance company" within the meaning of that phrase as it is commonly used and understood. There is no warrant for holding that Congress intended to use the expression in any other sense. *Miller* v. *Robertson,* 266 U. S. 243, 250. *Sacramento Navigation Co.* v. *Salz,* 273 U. S. 326, 329–330.

This case is not, as respondent contends, ruled against the Government by *United States* v. *Loan & Bldg. Co.,* 278 U. S. 55. The opinion in that case shows that loan and building associations exempt from taxes under Revenue Acts of 1918 and 1921 are not strictly confined to the raising of funds by subscription of members, for the making of advances to members to enable them to build or buy houses of their own; that the outside operations of the association there considered were not so related to mere money-making as to constitute a gross abuse of the name, and that the receiving of deposits on interest and making of loans to non-members did not disqualify it for the exemption.

In the case before us, respondent's charter authority extended not only to the business of insurance but also to other lines, including that of investment, with or without guaranties as it might choose. As above shown, the element of guaranty involved in its transactions in the tax years was not sufficient to make it an insurance company.

*Judgment reversed.*