HOME TITLE INSURANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 63737. Promulgated October 30, 1935.

*I. Herman Sher*, *Esq.*, for the petitioner.
*Arthur Clark*, *Esq.*, and *John Pigg*, *Esq.*, for the respondent.

ARUNDELL: The respondent determined a deficiency in petitioner's income tax for the year 1929 in the amount of $2,144.52. Petitioner claims that the respondent erroneously determined its tax liability under the general provisions of the Revenue Act of 1928 relating to corporations, and thus included income from all sources, whereas it is an insurance company and entitled to have its income determined under section 204, which treats as taxable income only certain kinds of the income of corporations subject to its provisions. Alleged errors relating to deductions were withdrawn at the hearing.

The proceeding was submitted on a detailed stipulation of facts, which we adopt, by reference, as our findings of fact.

Petitioner is a New York corporation, organized under the laws of that state pertaining to title and credit guarantee corporations, namely article V of the Insurance Law (Laws of 1892, ch. 690). In a proceeding which reached the Supreme Court that Court held the petitioner to be an insurance company (other than a life or mutual insurance company) and exempt from capital stock taxes for the years 1923 to 1925. *United States* v. *Home Title Insurance Co.*, 285 U. S. 191. The business of the petitioner in the year before us, 1929, was the same as in the earlier years and counsel for the respondent concedes that in 1929 petitioner was an " insurance company (other than a life or mutual insurance company)" within the purview of section 204 of the Revenue Act of 1928.

The plan of the Revenue Act of 1928 is to deal with insurance companies separately from other corporations and treat as gross income only (A) investment and underwriting income and (B) gain from the sale or other disposition of property. The position of the petitioner is that, being an insurance company, some of the items it returned as income and the respondent taxed are not within any of the items described by the revenue act as constituting income of insurance companies.

A brief description of the petitioner's business and the sources of its income will suffice for the purposes of this report. Its business consisted of (1) the insurance of titles to real estate and (2) the making of loans secured by real estate mortgages and the sale of such mortgages, in connection with which it guaranteed title and payment of the principal and interest. A person desiring a policy of title insurance made written application therefor and agreed, by signing the application, to pay the petitioner certain fees set forth therein whether or not the title was approved. As preliminary steps to the issuance of policies of insurance the petitioner examined and pre-

pared abstracts of title, made searches and procured information concerning the property. If a title was found to be insurable the petitioner issued a policy of insurance for which it received a fixed charge, collected for each policy when issued, based on a scale dependent upon the amount of the policy. The policies issued recited as follows:

This Policy of Insurance Witnesseth: That the Home Title Insurance Company in consideration of the payment of its charges for the examination of title, insures [name of insured] heirs and devisees, against all loss or damage * * *.

If the title was found to be uninsurable the petitioner was reimbursed, through payment of the charges listed in the application, for its time and expense in investigating the title.

In cases where an owner desired a first mortgage loan he would apply therefor and for an examination of title, and by signing the application he would agree to pay a listed schedule of fees for appraisals, inspections, conveyancing, etc. The petitioner would then examine the title to the property and make the necessary inspections and appraisals. If all matters were satisfactory the petitioner prepared a bond and mortgage and caused them to be executed by the applicant and recorded. It then paid to the applicant the face amount of the bond, less the charges for its services, and retained the bond and mortgage as security for repayment. The charges it received in such cases were the same as those in cases of issuing only title insurance plus fees for inspection and appraisal.

Petitioner sold to investors the bonds and mortgages issued by it or certificates of participation therein, at face value. On receipt from an investor of a request for a bond and mortgage petitioner issued a so-called policy of mortgage guaranty which guaranteed payment of the principal of the bond and a stated rate of interest which was less than the rate of interest stipulated in the bond, and also guaranteed the mortgage to be a valid first lien on a good and marketable title to the real estate on which the mortgage was placed. Petitioner, by agreement with the purchaser of the bond and mortgage, collected the interest and principal and retained as compensation all interest collected in excess of the rate guaranteed to the purchaser. This excess of interest received over interest guaranteed generally amounted to one half of one percent of the face amount of the bond and constituted the consideration received by petitioner for its guaranty of payment of principal and interest.

The primary purpose of petitioner in making loans on bonds and mortgages is not for investment, but for the sale thereof.

The gross income of the petitioner for 1929 as reported in its return and as determined by the respondent, allocated by the peti-

tioner on its books during 1929 to the various services performed and business done, consists of the following:

(1) Premiums for insuring titles_____ $47,962.19
(2) Income consisting of the difference between the interest received and guaranteed by the petitioner in connection with its mortgage guarantees_____ 370,805.90
(3) Fees for examining titles_____ 441,065.79
(4) Fees for searches relating to titles_____ 31,807.12
(5) Fees for inspections (other than examination of titles) and appraisals _____ 142,751.50
(6) Fees for searches (other than examination of titles) and drawing extension agreements in connection with repurchases of mortgages_____ 16,327.15
(7) Fees for continuing searches (other than examination of titles) and drawing agreements to extend mortgage loans__ 127,691.81
(8) Conveyancing fees_____ 15,308.50
(9) Fees for surveys other than examination of titles_____ 1,271.93
(10) Recording fees_____ 5,323.97

Total_____ 1,200,315.86
Other income_____ 364,726.28

Total income_____ 1,565,042.14

The petitioner concedes that items numbered (1) to (4) inclusive in the above tabulation are properly to be included in income. Its contention is that none of items (5) to (10) inclusive constitutes taxable income. A further description of items (5) to (10) is given in the stipulation as follows:

(5) the amount of $142,751.50 represents fees for inspections, other than the examination of any titles, and appraisals of real estate made by the petitioner; (6) the amount of $16,327.15 represents fees for searches, other than the examination of any titles, and drawing extension agreements in connection with repurchases of mortgages; (7) the amount of $127,691.81 represents fees for continuing searches (other than the examination of any titles) by the petitioner in connection with mortgage extensions and for its drawing of agreements to extend mortgage loans; (8) the amount of $15,308.50 represents fees and charges for services rendered by the petitioner in connection with drawing deeds, releases and various other papers; (9) the amount of $1,271.93 represents the petitioner's portion of fees and charges for surveys, other than the examination of any titles, made by others; (10) the amount of $5,323.97 represents that portion of the petitioner's fees and charges for recording which was in excess of the amount which the petitioner paid for the recording of the instruments involved.

The tax imposed by section 204 (a) is on net income, which is defined by subsection (b) as gross income as defined therein less the deductions allowed by subsection (c). There is no controversy here concerning deductions; consequently, there will be none concerning net income if the amount of gross income is determined. We are therefore interested only in those parts of the statute relating to

gross income. They provide, as far as here material, that gross income means the sum of (A) the amount earned from investment income and underwriting income and (B) gain from the sale or other disposition of property. Sec. 204 (b) (1). Counsel for respondent concedes that items (5) to (10) in the schedule above are neither investment income nor gain from the sale of property. This leaves the controversy turning upon whether those items are " underwriting income " within the meaning of the statute. That term is defined in the statute as follows:

SEC. 204 (b) (4). UNDERWRITING INCOME.—" Underwriting income " means the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred;

(5) PREMIUMS EARNED.—" Premiums earned on insurance contracts during the taxable year " means an amount computed as follows:

From the amount of gross premiums written on insurance contracts during the taxable year, deduct return premiums and premiums paid for reinsurance. To the result so obtained add unearned premiums on outstanding business at the end of the preceding taxable year and deduct unearned premiums on outstanding business at the end of the taxable year.

Thus the issue is narrowed down to whether or not items (5) to (10) above constitute " premiums." The petitioner quotes judicial definitions to the effect that a premium is the consideration paid for an insurance contract, and argues that none of the sums in items (5) to (10) were paid to or received by the petitioner as consideration for insurance, but were paid to and received by it for services and other matters incident to such insurance. Counsel for respondent likewise quotes definitions of the term " premium " to the same effect as those of the petitioner and takes the position that the services performed for which the items in controversy were received are indispensable features of petitioner's insurance business and that those items were part of the sums which the persons insured were required to pay as consideration for the issuance by the petitioner of its policies of insurance.

Upon the facts submitted it appears that the petitioner engaged in two kinds of business, namely, the insurance of titles to real estate and the lending of money. The insurance element predominated and it was therefore held to be an insurance company under the taxing statute. *United States* v. *Home Title Insurance Co., supra.* In another case decided at the same time the corporation's predominant business was the lending of money on real estate security, its income was largely from lending fees and extension fees and interest, and the income from the guaranteeing of mortgages was less than one third of its total income. It was held that this corporation was not an insurance company. *Bowers* v. *Lawyers' Mortgage Co.*, 285 U. S. 182. See also *Lincoln Mortgage & Title Guarantee Co.* v. *Commissioner*, 79 Fed. (2d) 585.

In connection with its insurance of titles the petitioner rendered two classes of service. One class was directly related to its insurance business, namely the examination of titles which it insured. The fees for that service are conceded to be taxable. The other class of service appears to be only indirectly related to the insurance of titles. It is to be noted that, in the description of items 5, 6, 7, and 9, the parties have expressly stipulated that the fees were for services "other than the examination of any titles." Some of the items had a very remote, if any, connection with petitioner's insurance of titles. For instance, items 6 and 7 include fees for drawing mortgage extension agreements. It is hard to see where there is any element of insurance in those items. Likewise as to item 8, fees for drawing deeds, releases, and other papers; and item 9, petitioner's portion of fees for surveys made by others; and item 10, fees for recording in excess of the cost of recording.

The policy of insurance issued by petitioner states the consideration therefor to be the "charges for examination of titles." It does not say that the consideration consists of all the charges paid by an applicant for a policy of title insurance. As above pointed out, the application lists a number of fees and charges which the applicant must pay. The fees for examination of titles and the fees for services rendered in making searches relating to titles are included in items (3) and (4) of the schedule above set out and are conceded by petitioner to be premiums.

Much of what we have said thus far applies equally to the money lending phase of petitioner's business. In this phase of the business, it rendered two classes of service, namely, (a) the lending of money secured by a mortgage or real estate and (b) the guaranteeing of title and of payment of principal and interest to the purchaser of the mortgage bonds. The petitioner issued no insurance of any kind to the borrower, and it can not be said that the borrower paid any insurance premiums. The items paid by the borrower are included in those examined and commented on above which we there pointed out were not paid as insurance premiums.

The insurance policies issued by the petitioner to purchasers of bonds were separate documents from the applications for loans. The policies provided that the petitioner "in consideration of the premium and agreements hereinafter set forth, hereby guarantees * * *" payment of principal and interest and that the mortgage is a first lien on a good and marketable title. The purchaser agreed "By the acceptance of this guarantee * * * to permit the Company to retain as its premium for this guarantee all interest collected in excess of the rate hereby guaranteed * * *." The parties have stipulated that the excess of the interest collected over that guaranteed constituted the consideration for petitioner's guarantee. We fail

to see by what reasoning the amounts paid by applicants for loans and embraced in items (5) to (10) above can be said to be premiums in the face of these declarations in the policy and the stipulation as to what constitutes the premium. It is not exactly clear whether items (3) and (4) include any sums paid by loan applicants, but if so there is no issue concerning them as the petitioner concedes the total of these items to premium income.

Congress recognized that the situation present in this case might develop as the result of the Supreme Court's decision in the *Home Title Insurance Co.* case, *supra*, and inserted a provision in the Revenue Act of 1932 to include in gross income of insurance companies other than life or mutual " all other items constituting gross income under section 22." Sec. 204 (b) (1), Revenue Act of 1932. In the report of the Finance Committee of the Senate on the Revenue Bill of 1932 it is said in part:

Under a recent decision of the Supreme Court, some of the title guaranty and mortgage guaranty companies are taxable as insurance companies, and since a substantial part of their income might not be classed as either underwriting or investment income, it might not come within the definition of gross income contained in this section. * * * The bill accordingly requires the inclusion in gross income of insurance companies taxable under section 204 of all items constituting gross income under section 22 other than items already specified in section 204. [Rept. 665, 72d Cong., 1st sess., p. 37.]

The change made in the Revenue Act of 1932 was not made retroactive and does not apply to the year here involved, 1929.

We are of the opinion, and so hold, that the sums in items (5) to (10) inclusive above set out, aggregating $308,674.86, are not premiums within the meaning of the statute and are not income to the petitioner under the Revenue Act of 1928.

*Decision will be entered under Rule 50.*