## EMPIRE TITLE & GUARANTEE CO. v. UNITED STATES.

### No. 146.

Circuit Court of Appeals, Second Circuit.

Jan. 9, 1939.

McPike & Zimmer, of New York City (Edward G. Zimmer, of New York City, of counsel), for plaintiff.

Michael F. Walsh, U. S. Atty., of Brooklyn, N. Y. (James W. Morris, Asst. Atty. Gen., J. Louis Monarch and Arthur L. Jacobs, Sp. Assts. to Atty. Gen., and Vine H. Smith and Hyman H. Goldstein, Asst. U. S. Attys., both of Brooklyn, N. Y., of counsel), for the United States.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

These are cross appeals by the taxpayer and government from a judgment entered granting recovery to the plaintiff for the first cause of action (1933 tax) and dismissing plaintiff's second cause of action (1934 tax). The taxpayer is a New York corporation organized under its insurance laws and subject to the regulations of the New York State Insurance Department. It filed a capital stock tax return for the taxable years ending June 30, 1933 and June 30, 1934. The taxpayer claimed exemption from the tax on the ground that it was an insurance company (other than a life or mutual life insurance) taxable under § 204 of the Revenue Acts of 1932, 47 Stat. 169, 225, and 1934, 48 Stat. 680, 733, 26 U.S.C. § 204, 26 U.S.C.A. § 204, and therefore within the exemption provided by § 215(c) (2) of the National Recovery Act, 48 Stat. 195, 207 and § 701 (c) (2) of the Revenue Act of 1934, 48 Stat. 680, 26 U.S.C.A. § 1358(c) (2). The Commissioner denied the claims of exemption and assessed $1,770.37 for 1933 and $1,798.51 for 1934 which represents the tax, interest and penalties. These sums were paid and this suit is for their recovery. Below the court concluded that the taxpayer's income for the taxable year 1933 was derived mainly from insurance sources during that year, but as to the second cause of action, it held otherwise. Both plaintiff and defendant appeal.

The taxpayer loans money on mortgages after examining the title and inspecting and appraising the property securing the mortgage. The mortgages are sold to the investing public with the taxpayer's guarantee. After it examines title it issues a title policy of insurance. It renews its guaranteed mortgages after they have matured; it renders service in recording titles, conveyancing, and servicing its guaranteed mortgages by supervising matters of insurance and taxes. During these years the taxpayer had on hand mortgages not disposed of and received 6% in-

terest thereon, which it maintains as a reserve fund to meet the taxpayer's liability on outstanding guarantees and title insurance.

It was found below that at the end of 1932 there were outstanding guaranteed mortgages and participating certificates amounting to $10,420,324.12, while undisposed of mortgages amounted to $1,866,363.95. At the end of the year 1933 outstanding mortgage guarantees were $7,940,187.50; undisposed of were $1,813,508.50. At the end of the year 1934, the outstanding guaranteed mortgages amounted to $7,299,366.70, while undisposed of mortgages amounted to $1,131,090.73. The taxpayer received 6% from the mortgages and paid 5½% to the mortgagees or the holders of participating certificates, thus earning ½% on these mortgages to cover the premium cost of its guarantee of payment of principal and interest. It obtained the full 6% on undisposed of mortgages. Therefore the business carried on by the taxpayer resulted in sales of mortgages to the extent of from seven to ten times the volume of the mortgages it did not sell, and its gross income included in 1932 was almost three times as much income from undisposed of mortgages as from outstanding guarantees; for 1933, one and a half times as much and for 1934 a little more than one-third as much. The court below concluded that for 1933 the taxpayer was an insurance company, finding that about 69% of its total income was derived from interest on both outstanding and unsold mortgages; but that the taxpayer was not an insurance company in 1934 because only about 34% of its income came from that source while about 42% was attributable to fees for searching titles for the Home Owners Loan Corporation on which the taxpayer issued no title guarantees.

If, as the Government contends, the income on undisposed of mortgages is not incidental insurance income, but income from the business of loaning money, the judgment on the first cause of action was erroneous. The taxpayer argues that the title search fees for 1934 should be broken down into two elements: those on which no guarantee was made—about 60% —and those on which a guarantee was made,—about 40%. Hence only about 28% of the income for 1934 was on nonguaranteed search items and thus the total insurance income for the year was not 34% but 48%.

What is an insurance company within the meaning of the statute has been considered by the courts and discussed by writers.[1]

Cases of life insurance and various forms of casualty and indemnity insurance contracts covering accident, fire, theft and other types of losses have presented no difficulty. There are situations involving the insurance of investments which have been troublesome. Confusion in classification of these investment insurance companies early occurred because some of the title guarantee companies were subject to regulation by the Superintendent of Insurance while others were subject to Banking Law, Consol.Laws, c. 2. A company under the insurance law, for example, was excluded from the benefits of reorganization under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, since it was an "insurance company". In re Union Guarantee & Mortgage Co., 2 Cir., 75 F.2d 984. This was because the state's classification was definite. The New York Banking Law makes no definite classification of the companies regulated by it and so-called title companies acting under the Banking Law were treated definitely as noninsurance companies, although they have been held not to be banking companies and the activities of the corporation were looked to in the absence of clear state classifications. In re Prudence Co., 2 Cir., 79 F.2d 77. Thus the courts have examined the activities from which the principal source of income was derived and the charter powers and state characterization; both tests would produce the same result once it is accepted that the guaranteeing of mortgages is insurance. Bowers v. Lawyers' Mortgage Co., 285 U.S. 182, 52 S.Ct. 350, 76 L.Ed. 690; United States v. Home Title Ins. Co., 285 U.S. 191, 52 S.Ct. 319, 76 L. Ed. 695; 35 Col.Law Review, 874, 875. However, such a technique of classification for the purpose of reorganization under § 77B is not necessary for the purpose of taxation since the statutes differ in their expression of Congressional intent. The purpose of exclusion of insurance companies from reorganization proceedings was to leave the dissolution or rehabilitation of certain quasi-public businesses to the state. Hence state characterization

---

[1] Vance on Insurance, p. 59; 37 Col. Law Review, 861, 862; 35 Col.Law Review, 874, 875; 34 Col.Law Review, 677, 683.

presumably carrying state control with it might best effectuate Congressional intent in the administration of the reorganization proceeding provisions. But here we are concerned only with a tax statute and hence the arguments for state characterization are not applicable. Bowers v. Lawyers' Mortg. Co., supra; United States v. Home Title Ins. Co., supra. Here the taxpayer is under the control of the Superintendent of Insurance. For the purposes of state control, the taxpayer is an insurance company but we must inquire as to its business from which it derives its principal source of income. In the Bowers Case, the taxpayer was incorporated under the New York Insurance Law, Consol.Laws, c. 28, to examine titles, procure and furnish information in relation thereto and guarantee or insure bonds and mortgages and the owners of real estate against loss by reason of defective titles. During the course of the tax year, the taxpayer did not insure any titles, but primarily loaned money on mortgages, and then sold the mortgages or participating certificates therein guaranteeing to the purchaser the title and payment of principal and interest. The taxpayer received income from both mortgages issued (one-half of one per cent) and unissued mortgages (six per cent). The court included both of these items as income in insurance premiums but because the taxpayer was engaged in the business of buying and selling mortgages as a broker at discount and profit, without guarantees, and because the fees derived therefrom were in excess of premium income, the taxpayer was held not to be an insurance company.

 Here, as held in the Bowers Case, the interest received from unsold mortgages was not incidental insurance income, but income from the loaning of money on real estate. Undoubtedly the premiums paid for title insurance in both of the tax years were insurance income, but they were insignificant as compared to the year's income. In 1932 the premiums from title insurance did not exceed three-fourths of one per cent of the total income; in 1933 and 1934 they were even less. As to this title income, what the taxpayer was primarily interested in was the profit derived from the examination of titles, and the amount derived from title insurance premiums was only incidental thereto. The income from examination of titles for mortgage guarantees, which the taxpayer

classifies as incidental insurance income, may not be so regarded. The largest item of income was in 1932 and 1933 interest on mortgages. In 1932 more than 55% of its income came from interest on mortgages not issued to the public for investment; in 1933, 40% of its income was from the same source. This was income derived from the business of lending money. Lincoln Mortg. & Title Guaranty Co. v. Com'r, 3 Cir., 79 F.2d 585. As to the interest on mortgages sold to the public with the taxpayer's guarantees, it is true that there is a relation between the business of lending money on the real estate security and the guarantee on those loans and mortgages when they are sold. But in both tax years, the business of loaning money was not subordinate to the insurance element of the taxpayer's business.

With reference to the income received in 1934 for searches made for the Home Owners Loan Corporation, this cannot be regarded as insurance income. In 1934, $54,428.51 was derived from these searches, which formed the largest single source of taxpayer's income, comprising nearly half of it. There was no insurance liability attached to most of it. Therefore, within the Bowers Case, the taxpayer's income derived from insurance premiums was not its principal source of income in either of the tax years.

The judgment is therefore reversed on the first cause of action and affirmed on the second, and judgment will be entered on both for the defendant.