COMMERCE TITLE GUARANTY CO. v. UNITED STATES.

Nos. 58, 59.

District Court, W. D. Tennessee, W. D. March 20, 1940.

J. E. McCadden, Dean Kimball, and Allan Davis, all of Memphis, Tenn., for plaintiff.

R. G. Draper, Asst. U. S. Atty., of Memphis, Tenn., and Paul S. McMahon, Sp. Asst. to Atty. Gen., for defendant.

MARTIN, District Judge.

In these consolidated civil actions, the petitioner, Commerce Title Guaranty Company, sues the United States of America for refund of capital stock taxes for the years ending June 30, 1936, and June 30, 1937, respectively; the payment of the taxes having been required by the Commissioner of Internal Revenue, pursuant to Sec. 105 of the Revenue Act of 1935, as amended by Sec. 401 of the Revenue Act of 1936, 26 U.S.C.A. Int.Rev.Acts.

The single question presented for determination is whether the petitioner falls within the express immunity of an "insurance company" from capital stock taxation, under a true interpretation of the provisions and meaning of the Act.

Petitioner was incorporated under the laws of Tennessee, January 30, 1934, and commenced business in Memphis on March 1, of the same year. The specific object of its incorporation was thus stated in its charter: "Making and furnishing abstracts of title to real estate; guaranteeing titles to real estate for a consideration to be agreed upon by the parties, and doing all acts usual and customary, or necessary, or proper in connection therewith; acquiring, owning, holding, leasing or operating an office building, or office buildings, or other real estate."

Before issuing any title guaranty policies, the company obtained a certificate from the State Insurance Commissioner licensing its conduct of the business of title insurance. It has periodically furnished proper reports to the Insurance Commissioner; has been examined by him from time to time; and has been licensed each year to conduct the real estate title guaranty business.

Upon its organization, petitioner was capitalized at one million dollars ($1,000,-000), divided equally into common and preferred stock. For a consideration of its entire capital stock and five hundred thousand dollars ($500,000) of bonds, secured by deed of trust on a fifteen-story office building at 12–16 South Main Street, Memphis, known as the Commerce Title Building, petitioner received and owned, when it commenced business, assets consisting of the large office building, all the capital stock of the Memphis Abstract Company, and all the title records formerly owned by the Bank of Commerce and Trust Company of Memphis and used by it in its title guaranty and abstract business.

The organization of the petitioner company was conceived in the voluntary liquidation in 1933 of a long-established banking institution, the Bank of Commerce and Trust Company of Memphis, whose capital stock surplus and reserves prior to its liquidation had reached an excess of five million dollars ($5,000,000).

Before the petitioner was organized, however, the National Bank of Commerce had obtained a charter for the purpose of continuing the banking business of the Bank of Commerce and Trust Company, and had received a conveyance of the banking quarters and liquid assets of the latter. The consideration between the two banking institutions had been the assumption by the newly organized National Bank of all the deposit liabilities of the State Bank, which was then in liquidation. The

necessity for liquidation of the Bank of Commerce and Trust Company had been caused by a "run" on the bank in January, 1933, as a result of which a bankers' committee had negotiated a loan of twelve million, five hundred thousand dollars ($12,500,000) from the Reconstruction Finance Corporation.

To secure the Reconstruction Finance Corporation, the bank pledged to the RFC all its choses in action and personal assets, and mortgaged to it all of the bank's real estate, including the Commerce Title Building.

A liquidating committee of the bank's stockholders, after considering several plans for the preservation of the title guaranty business of the bank, decided to organize the petitioner company, and deemed it wise for the petitioner to acquire the Commerce Title Building and the abstract plant, as conducive to the successful conduct of the title guaranty insurance business. The office building was regarded as a substantial backlog financially and a good advertisement of strength and stability, and the abstract plant was considered a highly valuable adjunct to the operation of the title guaranty business.

The proposed plan of organization of the petitioner company was submitted to the directors of the Reconstruction Finance Corporation, and the latter consented to the release of its prior lien upon the Commerce Title Building so as to leave an equity for policy holders and creditors of the Commerce Title Guaranty Company, the RFC receiving in pledge all the capital stock of the petitioner, together with its five hundred thousand dollars ($500,000) bond issue.

To present with sufficient particularity the facts upon which a correct decision of the point in this case must rest, it is necessary to review in historical and present detail the fiscal operations of the petitioner and its predecessors. From 1923 to 1932, the Bank of Commerce and Trust Company issued policies guaranteeing against defects in titles to real estate aggregating more than one hundred ninety-three million dollars ($193,000,000), and received as premiums therefor one million, thirty-four thousand, three hundred nine dollars and ninety-five cents ($1,034,309.95). The bank's net earnings from such business for the period were four hundred sixty-four thousand, five hundred forty-five dollars and eighty-one cents ($464,545.81). For the last two years of such period—that is, for 1931 and 1932—the bank earned from its rentals, after deducting for depreciation, taxes and operating expenses, seventy-three thousand, two hundred eighty-five dollars and fifty-nine cents ($73,285.-59); but, in 1933, the earnings from such source dropped to eighty dollars and ninety cents ($80.90).

From 1923 to 1928, inclusive, the title insurance premiums received or collected by the bank exceeded annually one hundred thousand dollars ($100,000), the highest premium year being 1925, when the title premium income amounted to one hundred fifty thousand, six hundred forty-eight dollars and fifty cents ($150,648.50). In the same six-year period, the net title premium earnings averaged sixty-seven thousand, five hundred eighteen dollars and thirty-six cents ($67,518.36), per year, and in no year fell below forty-one thousand nine hundred eighty-six dollars and twenty-six cents ($41,986.26). During the same period, the gross fees of the Memphis Abstract Company averaged seventy-one thousand five hundred five dollars and fifty-four cents ($71,505.54) per annum, and its net earnings averaged thirty-five thousand four hundred sixty-five dollars and sixty-nine cents ($35,465.69).

For five consecutive years, from 1923 to 1927, inclusive, the title insurance department of the bank issued title policies averaging around twenty-five million, eight hundred thousand dollars ($25,800,000) per annum.

From 1924 to 1926, inclusive, ninety per cent of the abstract orders from the Memphis Abstract Company, then owned by the Bank of Commerce and Trust Company, were delivered to the title guaranty department of the bank for the issuance of title guaranty policies.

Now, with respect to the business operations of the petitioner company: it has issued title insurance policies from the date of its organization to March 1, 1940, in an aggregate face amount of thirty-six million, six hundred ten thousand, eight hundred six dollars and ninety-seven cents ($36,610,-806.97). It has issued eighteen separate title guaranty policies insuring titles to real estate for amounts in excess of one hundred thousand dollars ($100,000), including one policy insuring the United States in the sum of five hundred thousand dollars ($500,-000); another insuring Memphis Housing Authority, a governmental agency, in a

like amount; and a third title policy insuring the Equitable Life Assurance Society in the principal sum of one million, five hundred thousand dollars ($1,500,000).

During the calendar years 1935 to 1937, inclusive, the plaintiff derived income from the following sources, in the following amounts:

Statement of Gross Earnings of Commerce Title Guaranty Company, from January 1, 1935, to December 31, 1937.

### 1935

| | | | Percent of Total Gross Income. |
|---|---|---|---|
| (1) | Title Department. | | |
| | Premiums | $ 28,885.65 | |
| | Capital Gain | 717.20 | |
| | Interest on Liberty Bonds | 1,660.07 | |
| | Dividend | 10,256.05 | |
| | Other Income | 115.60 | |
| | Total, Title Department | $ 41,634.57 | 24.63% |
| (2) | Abstract Department. | | |
| | Fees | $ None. | |
| (3) | Office Building. | | |
| | Rents | $127,433.63 | 75.37% |
| | Total, Gross-Income for year 1935 | $169,068.20 | 100.00% |

### 1936

| | | | |
|---|---|---|---|
| (1) | Title Department. | | |
| | Premiums | $ 37,576.75 | |
| | Interest | 15.10 | |
| | Interest on Government Bonds | 425.00 | |
| | Dividends | 25,000.00 | |
| | Other Income | 131.77 | |
| | Capital Loss | (18.73) | |
| | Liquidating Dividend, Memphis Abstract | 3,816.63 | |
| | Total, Title Department | $ 66,946.52 | 28.89% |
| (2) | Abstract Department. | | |
| | Fees, July 1, to December 31, 1936 | $ 30,043.86 | 12.96% |
| (3) | Office Building. | | |
| | Rents | 134,771.10 | 58.15% |
| | Total, Gross Income for year 1936 | $231,761.48 | 100.00% |

### 1937

| | | | |
|---|---|---|---|
| (1) | Title Department. | | |
| | Premiums | $ 41,374.40 | |
| | Interest | 582.28 | |
| | Other Income | 562.46 | |
| | Total, Title Department | $ 42,429.14 | 18.15% |
| (2) | Abstract Department. | | |
| | Fees | $ 55,364.40 | 23.61% |
| (3) | Office Building. | | |
| | Rents | 136,567.67 | 58.24% |
| | Total, Gross Income for year 1937 | $234,361.21 | 100.00% |

The petitioner has paid in advance of maturity, and retired, three hundred forty thousand dollars ($340,000) of its original issue of five hundred thousand dollars ($500,000) of fifteen-year bonds.

During the taxable years involved, 1936 and 1937, the petitioner has engaged in three general sorts of activity: (1) it has insured real estate titles, (2) it has engaged in the real estate abstract title business, and (3) it has operated a large office building. Petitioner has occupied nearly the entire second floor of its office building, and has leased to other tenants the ground floor and upper floors.

The ad valorem assessment of the Commerce Title Building, during the two taxable years involved, was one million, one hundred twenty-one thousand, two hundred fifty dollars ($1,121,250).

For the calendar year 1936, the operations of the Commerce Title Building resulted in a net loss of eight thousand, four hundred twenty dollars and eight cents ($8,420.08), and for the year 1937 resulted in a net loss of four thousand, fifty-four dollars and eighty-five cents ($4,054.85).

Each year since its organization, the petitioner has paid privilege taxes to the State of Tennessee, County of Shelby and City of Memphis.

Upon these facts, is the Commerce Title Guaranty Company an "insurance company" within the exemption for such from payment of the capital stock tax prescribed in Section 105 of the Revenue Act of 1935, as amended by Section 401 of the Revenue Act of 1936?

On the argument and in the briefs of contending counsel, two Supreme Court decisions, both rendered March 14, 1932, and published in the same volume of United States Reports, have been stressed: Bowers v. Lawyers' Mortgage Co., 285 U.S. 182, 52 S.Ct. 350, 76 L.Ed. 690; United States v. Home Title Insurance Co., 285 U.S. 191, 52 S.Ct. 319, 76 L.Ed. 695. In the first cited case, the taxpayer was held not to be an "insurance company" within the meaning of the Revenue Act; in the latter case, the title insurance company was held to be an "insurance company" within the meaning of Section 246 of the Revenue Acts of 1921 and 1924.

In the Bowers case, supra, the Court said (285 U.S. page 188, 52 S.Ct. page 353, 76 L.Ed. 690): "While name, charter powers, and subjection to state insurance laws have significance as to the business which a corporation is authorized and intends to carry on, the character of the business actually done in the tax years determines whether it was taxable as an insurance company." The Supreme Court

found that, although organized under and subject to New York insurance laws, with power to insure titles and loans on mortgages, the Lawyers Mortgage Company confined itself mainly to a business which could also be carried on under the banking laws, in that it engaged in the business of lending money on bonds and mortgages, selling the bonds and mortgages with its guaranty, and using the purchase money to make additional loans; and that the income from guaranties was less than one-third of its entire income.

In concluding its opinion, the Court said (285 U.S. page 190, 52 S.Ct. page 354, 76 L.Ed. 690): "In the case before us, respondent's charter authority extended not only to the business of insurance but also to other lines including that of investment with or without guaranties as it might choose. As above shown, the element of guaranty involved in its transactions in the tax years was not sufficient to make it an insurance company."

In the Home Title Insurance Company case, supra, the Court said (285 U.S. page 195, 52 S.Ct. page 321, 76 L.Ed. 695): "The amounts received as compensation for insuring title, for guaranteeing that mortgages are first liens, and for guaranteeing payment, constitute the larger part of respondent's income. And, when there are added the fees and charges for examination of title, appraisals, and other services incident to its insurance business, the total properly assignable to that business amounts to more than 75 per cent. of all respondent's income. Undeniably insurance is its principal business. Indeed, it does not appear that any substantial part of its transactions was not connected with or the outgrowth of insurance. The admitted facts clearly show that in the tax years above mentioned respondent was an 'insurance company' within the meaning of that phrase as commonly understood and as used in the Revenue Acts of 1921 and 1924. It was taxable under Section 246 and therefore exempt from capital stock taxes."

■ Applying the principles of these two Supreme Court decisions to the facts of the instant case, it becomes clear that the petitioner is not entitled to be exempted as an "insurance company" from the payment of the capital stock tax imposed in the pertinent Revenue Act, cited supra.

The significant and compelling facts are that in 1937, the gross earnings of the petitioner from its title department were only 18.15 percent of its total gross earnings, as compared with 23.61 percent from its abstract department, and 58.24 percent from rentals for space in its office building.

In 1936, petitioner's comparative gross earning returns were 28.80 percent from its title department, 12.96 percent from its abstract department, and 58.15 percent from office building rents; and, in 1935, the figures were 24.63 percent from its title department, as against 75.37 percent from office building rents.

Even treating its abstract department as an adjunct to its title guaranty business, the more substantial part of petitioner's entire business from the standpoint of income would still remain its office building operations. The above figures impel the conclusion that operating an office building and not insuring real estate titles was petitioner's principal business during the fiscal years ending June 30, 1936, and June 30, 1937. Cf. Lincoln Mortgage & Title Guaranty Co. v. Commissioner, 3 Cir., Sept. 1935, 79 F.2d 585.

Counsel for petitioner cite Tennessee statutes and decisions, as follows: Code of Tennessee, 1932, Secs. 6084, 6085, 6091, 6092; Volunteer State Life Insurance Co. v. Dunbar, 133 Tenn. 331, 181 S.W. 159; American Surety Co. v. Folk, Insurance Commissioner, 124 Tenn. 139, 135 S.W. 778, Ann.Cas.1912D, 1024; First National Bank v. Fidelity & Guaranty Co., 110 Tenn. 10, 75 S.W. 1076, 100 Am.St.Rep. 765.

■ These Tennessee Code provisions and decisions do not point the way to a decision adverse to the Government in the case before this court. With the clarity for which he was famous, Chief Justice Shields defined insurance (124 Tenn. page 141, 135 S.W. page 779, Ann.Cas.1912D, 1024, supra): "The text-books upon the subject and the adjudged cases define insurance to be a contract by which one party, for an adequate consideration paid to him, undertakes to indemnify or guarantee the other against loss by certain specified risks—an agreement wherein one becomes surety to another that the latter shall not suffer loss or damage upon the happening of certain contingencies, upon specified terms."

Admittedly, a substantial portion of petitioner's activities consists in writing title guaranty insurance, but the proof certainly fails to show that its "principal business" was such. See 285 U.S. 191, 52 S.Ct. 319,

76 L.Ed. 695; 285 U.S. 182, 52 S.Ct. 350, 76 L.Ed. 690, supra.

Brown v. Schleier, 8 Cir., 118 F. 981, cited by petitioner, is not considered to be in point on the issue here.

■ United States v. Peabody Co., 6 Cir., June 9, 1939, 104 F.2d 267, indicates plainly that the intention of the organizers of a corporation as to the character of business to be conducted does not relieve the corporation from taxation on the basis of business actually done.

Applying the foregoing applicable law to the facts found, the judgment to be entered is that the complaints of petitioner in each of these consolidated cases be dismissed with costs.