**UNITED STATES of America,**
**Plaintiff,**

v.

**GENERAL ADJUSTMENT BUREAU,**
**INC., Defendant.**

**No. 71 Civ. 1109.**

United States District Court,
S. D. New York.

April 27, 1973.

Thomas E. Kauper, Dept. of Justice, Washington, D. C. by John H. Waters, and Stephen F. Sonnett, of counsel, for plaintiff.

Shearman & Sterling, New York City by Robert H. Knight, New York City of counsel, for General Adjustment Bureau, Inc.

Kelley, Drye, Warren, Clark, Carr & Ellis, New York City by Leland J. Markley, New York City, of counsel, for American European Associates, Inc.

Carter, Ledyard & Milburn, New York City by Richard McCluny, New York City, of counsel, for Trustee (United States Trust Co. of N. Y.).

Richard Farman, Los Angeles, Cal., for Unionamerica, Inc.

## OPINION

POLLACK, District Judge.

The defendant, General Adjustment Bureau, Inc., (GAB hereafter) has ap-plied for a construction of the scope of Section VII of the Final Judgment entered herein by this Court on consent of the parties on April 15, 1971. The suit was brought by the government for alleged violation of the antitrust laws and prior to trial or adjudication of any issue of fact or law the parties agreed on a judgment to be entered. Included therein is a provision that jurisdiction is retained by this Court for the purpose of enabling either of the parties to apply for such orders and directions as may be necessary or appropriate for the construction or carrying out of the Judgment.

The decree required the insurance company shareholders of approximately 82% of the stock of the defendant to divest themselves of their interests within a fixed period of time through the offices of a Trustee appointed for that purpose. The Trustee was directed to sell the stock in one of three specified ways. It now proposes to do so under an alternative which allows sale to a single purchaser "provided that such purchaser is not an insurance company or a person owned or controlled directly or indirectly by an insurance company."

United States Trust Company of New York, as Trustee, proposes to recommend to the owners of the stock that they accept an offer from a new corporation, New GAB, to purchase their stock. New GAB will be owned 51% by Unionamerica, Inc. ("UNI") (12% by direct acquisition and 39% on an option which will be exercised) and 49% by an investment partnership comprised of American European Associates Inc. and a group of investors, and by management of New GAB.

The government opposes the transaction contending that UNI is an "insurance company" within the meaning of the consent decree, or is at least a conduit for a new holding company whose business will principally be insurance.

UNI is a publicly owned diversified financial holding company whose principal subsidiary is Union Bank, Los Ange-

les, California, the nineteenth largest commercial bank in the United States. UNI was incorporated in 1967 for the purpose of becoming a holding company to acquire banking and other business interests. Its wholly owned subsidiaries include Swett and Crawford (a wholesale insurance marketing organization and surplus-line broker for commercial lines of property and casualty insurance) and two property and casualty underwriters, *viz.*, Harbor Insurance Company ("Harbor") and Buffalo Insurance Company ("Buffalo"). Swett and Crawford controls Harbor and Buffalo and is responsible for the production of all their direct insurance underwritings. Harbor is authorized to write all classes of insurance except life, title and mortgage; Buffalo is authorized to write fire, marine, casualty and property insurance.

UNI's 1971 Annual Report reflects that its "Insurance Group" gross premiums were in excess of $91 million in 1971. This group commands a material share of the market in various lines of insurance covering property and casualty risks. The total direct premiums written by Harbor and Buffalo in 1972 was over $50 million.

UNI does not itself engage in any insurance activities. UNI is subject to regulation as a bank holding company under the Bank Holding Company Act of 1956, as amended by the Bank Holding Company Act Amendments of 1970 (Pub.L.No. 91–607, codified at 12 U.S.C. §§ 1841 et seq.). The Act and regulations thereunder (12 C.F.R. § 225.4(d)) prohibit UNI from retaining after January 1, 1981 any non-bank related interests.

Under a plan of reorganization Union Bank will be separated from UNI's other activities and a new bank holding company will be created which will own Union Bank and certain bank-related activities, and a second new holding company will own UNI's other subsidiaries and divisions, including insurance activities. It is estimated, using 1971 figures, that this second new holding company will derive 62% of its gross revenues from insurance business. It is anticipated that the planned organization will be consummated late in 1973.

During the five years ended December 31, 1971, commercial banking contributed an average of over 80% of UNI's gross revenues while gross revenues from insurance averaged under 12%. UNI's income after taxes from these sources was in approximately the same proportions, *viz.*, about 81% and 9%. Manifestly, insurance activities were not a predominant part of UNI's business.

The sole issue at this time is whether UNI may become the purchaser of GAB stock or whether it is to be deemed an insurance company and thus barred from the proposed transaction.

There is no specific definition of an insurance company in the antitrust laws. An "insurance company" has been twice specifically defined by Congress in the securities laws as one "whose primary and predominant business activity is the writing of insurance or the reinsuring of risks underwritten by insurance companies." 15 U.S.C. § 80a–2(a)(17). *See also* Bowers v. Lawyers Mortgage Co., 285 U.S. 182, 188–190, 52 S.Ct. 350, 76 L.Ed. 690 (1932); United States v. Home Title Insurance Co., 285 U.S. 191, 195, 52 S.Ct. 319, 76 L.Ed. 695 (1932); National Commercial Title & Mortgage Guaranty Co. v. Duffy, 132 F.2d 86, 89 (3d Cir. 1942).

The government directs attention to the underlying "purpose" of the decree to support its contention that UNI is in the class of prohibited purchasers, contending "that the intent of the parties as manifested in the Judgment is to have New GAB owned or controlled by interests which are wholly independent from insurance interests." It argues that failure to give effect to such an intention, although unexpressed in the decree itself, will give rise to all of the evils which the government sought to prevent when it filed its original complaint herein, charging that defendant, all of whose stock was owned by approx-

imately 170 insurance companies, had combined and conspired with its shareholders in violation of Sections 1 and 3 of the Sherman Act by causing said shareholders, *inter alia*, to utilize defendant's adjusting facilities, boycott independent adjusters, and coerce and intimidate agents to channel claims to defendant. It was also charged that defendant and its insurance company shareholders had established uniform practices and procedures to be used in the adjustment and settlement of claims. In addition, it was alleged that the conspiracy as charged had the effect of eliminating competition among the shareholder insurance companies in the adjustment and settlement of claims and denying insureds the benefits of such competition.

A lengthy exposition of these presumed evils is set forth. The government contends that the intent of the parties as indicated by the plan and use of language in the decree was to prevent any company which is related to insurance interests from acquiring control of the divested GAB stock.

■ The law is clear that this Court may not look to such circumstantial factors, however convincing they may be, in construing a decree; indeed, it may not look beyond express terms employed within the four corners of the decree itself. United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 29 L. Ed.2d 256 (1971); United States v. Shubert, 163 F.Supp. 123, 124 (S.D.N.Y.1958)(Kaufman, J.); Handler, Twenty-fourth Annual Antitrust Review, 72 Columbia L.Rev. 1, 33 (1972) ("The difficulty of ascertaining the decree's objectives is not overcome by examining the complaint. The pleadings reveal the government's purpose in bringing the suit, but that is quite different from the aims of the decree that terminates the litigation.")

In the *Armour* case, the Supreme Court stated:

Consent decrees are entered into by the parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their rights to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with the litigation. Thus the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of these opposing purposes as the respective parties have the bargaining power and skill to achieve. For these reasons, *the scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties* to it. Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation. (United States v. Armour & Co., 402 U.S. 673, 681–682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971) (last emphasis added) (footnote omitted)).

■ This standard is no different from that prevailing in this Circuit prior to the decision in *Armour*: "A consent decree represents an agreement by the parties which the court cannot expand or contract." Artvale, Inc. v. Rugby Fabrics Corp., 303 F.2d 283, 284 (2d Cir. 1962) (*per curiam*); *accord*, Great Lakes Carbon Corp. v. Eagle Lumber Dealers Supply Co., 402 F.2d 106, 108 (7th Cir. 1968); Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc., 341 F.2d 101, 102 (2d Cir. 1965); Star Bedding Co. v. Englander Co., 239 F.2d

537, 542 (8th Cir. 1957); Butler v. Denton, 57 F.Supp. 656, 660 (E.D.Okl.1944), aff'd, 150 F.2d 687 (10th Cir. 1945); *cf.* United Steelworkers v. Copperweld Steel Co., 230 F.Supp. 383, 390 (W.D.Pa. 1964). In United States v. American Society of Composers, Authors & Publishers, 331 F.2d 117, 123–124 (2d Cir.), cert. denied, 377 U.S. 997, 84 S.Ct. 1917, 12 L.Ed.2d 1048 (1964), the Second Circuit said: "It is important to the obtaining of consent decrees, on which the effective enforcement of the antitrust law depends in no small degree, that defendants who sign them should know these will not be stretched beyond their terms."

*Armour* recognized the possibility that the terms of a decree might allow a later construction which would frustrate some of the intentions of the government in bringing the original suit, but noted that "where we deal with the construction of an existing consent decree, such an argument [although of great force if addressed to a court charged with responsibility for formulating original relief] is out of place." 402 U.S. at 680–681, 91 S.Ct. at 1757.

The government makes the further argument that a construction such as is sought by the defendant herein would result in the government "being precluded under the antitrust laws" from attacking transactions it feels are violative of those laws. This does not follow at all, as *Armour* made clear: the government is merely unable to use the consent decree as a foundation for reasserting the original accusations which were put aside when the terms of the decree were consented to. 402 U.S. at 675, 91 S.Ct. 1752.

■ Nothing in the decree, or the defendants' reading thereof, insulates the proposed transaction from antitrust scrutiny *de novo* by the government; all its remedies, if any, under section 7 of the Clayton Act are available, as is any other appropriate remedy under any other federal antitrust statute; alternatively, it may, if it is so advised, seek modi-

fication of the consent decree by way of a litigated proceeding. What it may not do is ask this Court to expand the agreement of the parties as embodied by the decree. Artvale, Inc. v. Rugby Fabrics Corp., *supra.*

The decree negates the government's contention that the parties were imprecise in the language used. For example, where reference was desired to a category of persons who might in any way be "affiliated" with insurance interests, this was expressed, and in clear language (*see* the last sentence of section VII—the divestiture section). Similarly, when providing for the voting by the Trustee of stock in its possession to elect persons to the Board of Directors, the parties defined "unaffiliated persons" with precision and directed the Trustee to cast its ballot only for such persons (section VI). Indeed, the definition of "unaffiliated persons" in section VI, were it also to appear in or apply to section VII, would clearly bar UNI as a purchaser since the definition in Section VI excludes from that category ("unaffiliated persons") a stockholder owning more than one percent of the stock of any insurance company. The very presence of this definition in section VI, and the absence of corresponding terms from section VII, is an objective manifestation of the "purpose" of the parties.

As the *Armour* Court has noted, a consent decree is the embodiment of a compromise between opposing purposes brought about by the interplay of the respective bargaining power and skill of the parties, who each give up something they might have won had they proceeded with the litigation. 402 U.S. at 681–682, 91 S.Ct. 1752. "Inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." Milstein v. Werner, 57 F.R.D. 515, 524–525 (S.D. N.Y.1972). The government consented to the decree in its final form, as did the defendant. Both are equally bound by its terms *as written.*

■ The prohibition of the decree herein runs against the sale of stock to

an insurance company or a person *owned or controlled by* an insurance company. It does not touch in any way upon a person who *owns or controls* an insurance company, as UNI admittedly does, or a person who is owned or controlled by a person who *also owns or controls* an insurance company, as the new company would be. Taking the language of the decree in its "natural sense" 402 U.S. at 678, 91 S.Ct. 1752, this Court is unable to conclude that either UNI or the new holding company in prospect is an "insurance company". The decree in no way prohibits a sale to a conglomerate holding company having subsidiaries in the insurance business.

So ordered.