# NATIONAL COMMERCIAL TITLE & MORTGAGE GUARANTY CO. v. DUFFY et al.

### No. 1262.

District Court, D. New Jersey.

Dec. 30, 1941.

Lindabury, Steelman, Zink & Lafferty, and James L. R. Lafferty, all of Newark, N. J., for plaintiff.

Charles M. Phillips, U. S. Atty., of Trenton, N. J., and Paul R. Russell, Sp. Asst. to the Atty. Gen., for defendant.

WALKER, District Judge.

The facts are:[1]

1. This action arises under an act of Congress providing for internal revenue, namely, the Act of June 16, 1933, 48 Stat. 195, as amended.

2. Plaintiff is a corporation of the State of New Jersey organized under an act entitled "An Act to provide for the regulation and incorporation of insurance companies and to regulate the transaction of insurance business in this state," approved April 3, 1902, and known as Ch. 134 of the Laws of 1902 of the State of New Jersey, as amended, N.J.S.A. 17:17–1 et seq.

3. The certificate of incorporation was dated January 25, 1926, approved by the Attorney General on January 26, 1926, filed in the office of the Department of Banking and Insurance on January 28, 1926, and the company commenced business on March 9, 1926. At all times plaintiff has been under the direct supervision and control of the Commissioner of Banking and Insurance for the State of New Jersey.

4. In February, 1935, the Commissioner of Internal Revenue assessed the plaintiff a capital stock tax for the period July 1, 1932, to June 30, 1933, in the amount of $6,034, together with interest in the amount of $1,142.44, making a total assessment of $7,176.44.

5. The Commissioner of Internal Revenue, in making such assessment, purported to act under the provisions of Section 215 of the Act of June 16, 1933, the National Industrial Recovery Act, 48 Stat. 207, as amended, and assessed said tax upon the theory that the plaintiff was not entitled to the exemption from capital stock tax provided for companies which qualified under the applicable revenue statute as insurance companies. On January 23, 1935, the Commissioner of Internal Revenue denied plaintiff's claim for exemption from the provisions of said Section 215 of the Act of June 16, 1933, the National Industrial Recovery Act, as amended, which denial was affirmed by letter of August 5, 1935.

6. On August 22, 1935, plaintiff paid, under protest, said assessment of $6,034, together with interest and penalties in the amount of $1,735.68, making a total payment of $7,769.68, to Charles V. Duffy, defendant's testator, who was at that time the Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

7. On August 15, 1939, claim for refund of said capital stock assessment was filed by plaintiff with the Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

---

[1] Rule 52, Federal Rules of Civil Procedure, Title 28 U.S.C.A. following Section 723c.

8. On December 17, 1935, the said Charles V. Duffy died a resident of Passaic County, leaving a last will and testament wherein and whereby he appointed Margaret Duffy executrix, which will was thereafter duly admitted to probate by the Surrogate of Passaic County and letters testamentary thereon issued to Margaret Duffy who duly qualified.

9. In August, 1935, the Commissioner of Internal Revenue made a capital stock assessment against the plaintiff for the period July 1, 1933, to June 30, 1934, in the amount of $6,122, together with interest in the amount of $781.93, making a total assessment of $6,903.93.

10. The Commissioner of Internal Revenue, in making such assessment purported to act under the provisions of Section 215 of the Act of June 16, 1933, the National Industrial Recovery Act, as amended, and Section 701 of the Revenue Act of 1934,[2] and assessed said tax upon the theory that the plaintiff was not entitled to the exemption from capital stock tax provided for companies which qualified under the applicable revenue statute as insurance companies.

11. On December 7, 1935, plaintiff paid, under protest, said assessment of $6,122, together with interest and penalties in the amount of $1,140.75, making a total of $7,262.75, to the said Charles V. Duffy, the defendant's testator, who was at that time the Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

12. On December 2, 1939, claim for refund of said capital stock assessment was filed by plaintiff with the Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

13. In May, 1938, the Commissioner of Internal Revenue made a capital stock assessment against the plaintiff for the period July 1, 1934, to June 30, 1935, in the amount of $5,915, together with interest in the amount of $1,061.38, making a total assessment of $6,976.38.

14. The Commissioner of Internal Revenue, in making such assessment, purported to act under the provisions of Section 215 of the Act of June 16, 1933, the National Industrial Recovery Act, as amended, and Section 701 of the Revenue Act of 1934,[3] and assessed said tax upon the theory that the plaintiff was not entitled to the exemption from capital stock tax provided for companies which qualified under the applicable revenue statute as insurance companies. On April 8, 1938, the Commissioner of Internal Revenue denied plaintiff's claim for exemption from the provisions of said Section 215 of the Act of June 16, 1933[4].

15. On July 5, 1938, plaintiff paid, under protest, said assessment of $6,915, together with interest and penalties in the amount of $1,061.38, making a total payment of $6,976.38, to Thomas C. Smith, who was at that time the Acting Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

16. On December 2, 1939, claim for refund of said capital stock assessment was filed by plaintiff with the Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

17. In March, 1938, the Commissioner of Internal Revenue made a capital stock assessment against the plaintiff for the period July 1, 1935, to June 30, 1936, in the amount of $3,500, together with interest in the amount of $365.53, making a total of $3,865.53.

18. The Commissioner of Internal Revenue, in making such assessment, purported to act under the provisions of Section 215 of the Act of June 16, 1933,[5] and assessed said tax upon the theory that the plaintiff was not entitled to the exemption from capital stock tax provided for companies which qualified under the applicable revenue statute as insurance companies. On April 8, 1938, the Commissioner of Internal Revenue denied plaintiff's claim for exemption from the provisions of said Acts.

19. On May 16, 1938, plaintiff paid, under protest, said assessment of $3,500 together with interest and penalties in the amount of $365.53, making a total payment of $3,865.53, to the said Thomas C. Smith, defendant, who was at that time the Acting

---

[2] 48 Stat. 769, 771, §§ 701, 703, 26 U. S.C.A. Int.Rev.Acts, pages 787, 789.

[3] The Act of May 10, 1934, 48 Stat. 769, 771.

[4] The National Industrial Recovery Act, as amended, and Section 701 of the Revenue Act of 1934, the Act of May 10, 1934, 48 Stat. 769, 771.

[5] The National Industrial Recovery Act, as amended, and Section 105, of the Revenue Act of 1935, the Act of August 30, 1935, 49 Stat. 1017, as amended, 26 U.S.C.A. Int.Rev.Acts, pages 796, 798.

Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

20. On December 2, 1939, claim for refund of said capital stock assessment was filed by plaintiff with the Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

21. In March, 1938, the Commissioner of Internal Revenue made a capital stock assessment against the plaintiff for the period July 1, 1936, to June 30, 1937, in the amount of $1,946, together with interest in the amount of $86.48, making a total assessment of $2,032.48.

22. The Commissioner of Internal Revenue, in making such assessment, purported to act under the provisions of Section 215 of the Act of June 16, 1933, [6] and assessed said tax upon the theory that the plaintiff was not entitled to the exemption from capital stock tax provided for companies which qualified under the applicable revenue statute as insurance companies. On April 8, 1938, the Commissioner of Internal Revenue denied plaintiff's claim for exemption from the provisions of said acts.

23. On May 16, 1938, plaintiff paid, under protest, said assessment of $1,946, together with interest and penalties in the amount of $86.48, making a total payment of $2,032.48, to the said Thomas C. Smith, defendant, who was at that time the Acting Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

24. On December 2, 1939, claim for refund of said capital stock assessment was filed by plaintiff with the Collector of Internal Revenue of the United States for the Fifth District of New Jersey.

25. On September 25, 1940, the claims for refund hereinbefore referred to were disallowed by the Commissioner of Internal Revenue.

26. At all times the plaintiff had the charter powers of an insurance company but the greater part of its income during the years in controversy was derived from non-insurance sources.

27. Plaintiff on March 6, 1933, commenced liquidating its affairs and it has continued liquidating its affairs since that date and it has not carried on or done business after March 6, 1933.[7]

### Discussion.

The questions are:[8]

(a) Whether the taxpayer was an insurance company within the meaning of the federal revenue statutes so that it was entitled to exemption from capital stock taxes for the fiscal years June 30, 1933, to June 30, 1937, inclusive?

(b) Whether plaintiff's complaint and its claim for refund are adequate to raise the point argued in its brief, that it was not liable for capital stock taxes for the years June 30, 1934 to June 30, 1937, inclusive because it was not engaged in business subsequent to March 1, 1933?

(c) In the event the Court has jurisdiction to consider the question, whether plaintiff was engaged in business so that it was liable for capital stock taxes for the fiscal years ended June 30, 1934 to June 30, 1937, inclusive?

(d) Is William H. Kelly a proper party defendant?

The plaintiff has the burden of establishing that during the period in question it was an insurance company within the meaning of Section 204 of the Revenue Act of 1932, and the corresponding provisions of later acts, and not liable for capital stock taxes.[9]

The name, charter powers, and subjection to state insurance laws have significance as to the business which a corporation is authorized and intends to carry on, but the character of the business actually done in the tax years determines whether it was taxable as an insurance company.[10]

---

[6] The National Industrial Recovery Act, as amended, and Section 105 of the Revenue Act of 1935, the Act of August 30, 1935, 49 Stat. 1017, as amended.

[7] Facts stipulated by the parties. Stipulation filed October 9, 1941. Supplemental Stipulation filed December 12, 1941.

[8] It is unnecessary to discuss estoppel, recoupment or offset because the plaintiff is found to have been subject to Section 215 of the National Industrial Recovery Act, as amended for the years in question. Its contention that it was taxable as an insurance corporation under Section 204 of the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Acts, page 548, and the corresponding provisions of later acts is rejected.

[9] Bowers v. Lawyers' Mortg. Co., 285 U.S. 182, 52 S.Ct. 350, 76 L.Ed. 690.

[10] Bowers v. Lawyers' Mortg. Co., supra; United States v. Home Title Ins. Co., 285 U.S. 191, 52 S.Ct. 319, 76 L. Ed. 695.

The balance sheet attached to plaintiff's income tax return for 1932, shows capital and surplus of $6,034,961.96[11]. Under the heading "Other Investments" the company carried stocks of domestic corporations in the sum of $880,775.89, and mortgages in the sum of $31,967,682.15. The item "Mortgages" listed among the liabilities in the balance sheet and amounting to $27,122,413.25, represented plaintiff's liability under its guaranties.[12] The said financial statement shows $4,845,268.90, invested in mortgages[13] and a total of $5,726,044.79[14] invested in stocks and mortgages[15].

It is evident a substantial part of plaintiff's revenues are properly classifiable as income from investments. The income tax return for 1932 reported the interest income as $1,776,268.27.[16] In addition to the interest thus reported the premium income amounted to $138,539.98. The total income reported amounted to $1,952,396.87. In order to determine the true income, we subtract $1,508,496.08, the interest the company was required to collect and turn over to the guaranteed investors[17] from $1,645,131.06, the total interest on guaranteed mortgages and get $136,634.98, the amount of premiums earned by the plaintiff in 1932, from the insurance phase of its business.

Although it is arguable under the decisions that the entire sum, $136,634.98, is not classified properly as insurance income because it covers not only the compensation properly due to an insurer for the risks assumed, but also agency and other services enumerated in the guaranty policies.

In Lincoln Mortgage & Title Guaranty Co. et al. v. Commissioner of Internal Revenue[18], the Third Circuit commented upon the fact that part of the premiums of one-half of one per cent representing the part of the interest retained by the taxpayer, covered services not usually performed under contracts of insurance[19].

After eliminating from plaintiff's income for 1932, the collections required to be made for the account of guaranteed investors, the gross income from all sources amounted to $443,489.11[20]. Aside from the premium income constituting approximately 31% of the total[21], the bulk of the remaining income of $306,854.13, consisted of interest, which amounted to $270,347.29.

■ Interest constitutes income from investments and it is not considered insurance income.[22]

The figures for the years 1933, 1934, 1935 and 1936 do not change the picture and the aforesaid ruling also applies to each of said years[23]. In the years 1934, 1935 and 1936, a further source of income consisting of rentals from foreclosed properties and interest comprised the bulk of the income but interest from lending money, dividends, and rentals from real estate do not constitute insurance income, and the plaintiff has failed to sustain its burden of proving it was entitled to be taxed as an insurance company.

This court recognizes that timely claims should be filed with the Commissioner of Internal Revenue prerequisite to suit. Article 1254 of Treasury Regulations 77 promulgated under the Revenue Act of 1932, and the corresponding provisions of subsequent regulations specified that the claim for refund should be made on Form 843 and, also, that it must set forth in detail and under oath each ground upon

[11] Stipulation. Schedule H. 1.

[12] The plaintiff insists and we do not conclude or decide to the contrary that the mortgages assigned as collateral against the corporation's guaranties did not belong to it.

[13] The difference between $31,967,682.15 and $27,122,413.25.

[14] The total of $880,775.89 and $4,845,268.90.

[15] Capital-Surplus $6,034,961.96 less $5,726,044.79—$308,917.17.

[16] Stipulation. Schedule H. 1.

[17] This is done to avoid conflict with plaintiff's contention that the mortgages assigned as collateral against the corporation's guaranties do not belong to it.

[18] 79 F.2d 585, certiorari denied 296 U.S. 654, 56 S.Ct. 381, 80 L.Ed. 466.

[19] In order to avoid unnecessary detail we shall classify herein all such premiums as insurance income.

[20] $1,645,131.06 minus $1,508,496.08 = $136,634.98 plus $306,854.13 = $443,489.11.

[21] $1,645,131.06 minus $1,508,496.08 = $136,634.98 or 30.8% of $443,489.11.

[22] Empire Title & Guarantee Co. v. United States, 2 Cir., 101 F.2d 69; Bowers v. Lawyers Mortgage Co., supra; Commerce Title Guaranty Co. v. United States, D.C.W.D.Tenn., 32 F.Supp. 73; Inter-County Title Guaranty & Mortgage Co. v. Rasquin, D.C.E.D.N.Y., 38 F.Supp. 735.

[23] See Stipulation. Schedules L 2, M 2, N 2, O 2 and P 2, and alternative Schedules L 4, M 4, N 4, O 4 and P 4.

which a refund was claimed, together with facts sufficient to apprise the Commissioner of the exact basis thereof.

Plaintiff has complied with the requirement that its claims be filed on Form 843, and it has set forth the ground for refund viz; the plaintiff was an insurance company, and therefore exempt from capital stock taxes. It has not set forth that it was not doing business.

We move from Form 843 to the Complaint filed herein. It does not specifically state that the refund is sought because plaintiff was not "doing business" during all or part of the period in question, however, the new rules of civil procedure for District Courts[24] require us to give said Complaint a broad and liberal interpretation. Under the rules a demand for refund without more is sufficient. If the defendants had desired to limit or clarify said demand it could have done so.

If we dismissed the suit, the plaintiff could and it says it would file a new claim for refund and another suit within the period of limitation which has not expired with respect to the capital stock taxes paid for the years ending June 30, 1935, 1936 and 1937.[25]

In order to terminate litigation on the earliest possible date, we conceive it to be our duty to determine whether the plaintiff was "doing business" during the years within the period of limitation.[26]

On March 6, 1933, the President of the United States proclaimed a bank holiday and thereafter, by executive order, extended the proclamation to apply to corporations engaged in the business in which the plaintiff was then engaged. The effect of the proclamation by executive order was to suspend the plaintiff's business activities.

On March 16, 1933, Chapter 71 of the Laws of the State of New Jersey for the year 1933, p. 133, was approved by the government after passage by the legislature and became effective immediately and applied to the plaintiff.

By this Act the Commissioner of Banking and Insurance of the State of New Jersey was authorized, among other things, to suspend in whole or in part the payment of principal or interest to investors on the guaranties issued by mortgage guaranty companies, except to the extent that same might be collected by the mortgage companies, and to authorize or require the alteration or amendment or waiver of any of the terms and provisions of the obligations. Pursuant to this power the Commissioner of Banking and Insurance proclaimed General Order No. 1[27]. This order, among other things, forbade the plaintiff to do any new business by way of making new loans or selling new investments or guaranties. It further directed the plaintiff as soon as practicable to submit to the Commissioner a plan "to conserve the assets * * * and secure ratable and equitable application thereof. * * *" Complying with this order, the plaintiff proposed to its investors on January 10, 1934, a plan of operation[28]. This plan, by its terms, continued in effect from July 1, 1935, to July 1, 1940, and thus, together with General Order No. 1, embraces the period from which tax liability is asserted.

In fact, as a result of the proclamation of the executive order, General Order No. 1 of the Commissioner of Banking and Insurance and the Plan, after March 6, 1933, no new mortgage loans were made or new guaranty policies issued (except as required by renewals or extensions) and the company proceeded to liquidate its affairs.

Article 43 of Regulation 64 contains a broad definition of the phrase "doing business" as used in this Act. It contains, however, certain exceptions, among which is the corporation which is merely liquidating. See example (1) set forth under that Article:

"(1) A corporation is not subject to the tax if its corporate powers are limited to the mere owning and holding of property and the distribution of its avails, or, although incorporated for the purpose of doing business, if it has retired from the business for which it was organized and has reduced its activities to the mere ownership and holding of property, the distribution of its avails, and doing only such acts as are

---

[24] Title 28 U.S.C.A. following Section 723c.

[25] Stipulation, paragraphs 15, 19, 23.

[26] See Tucker v. Alexander, 275 U.S. 228, 48 S.Ct. 45, 78 L.Ed. 253; National Commercial Title & Guaranty Co. v. Kelly, D.C.N.J.1941, 39 F.Supp. 339.

[27] Copy of which is annexed to the Stipulation herein as Schedule R.

[28] Marked Schedule S in the Stipulation filed herein.

necessary to the maintenance of its corporate existence and the private management of its purely internal affairs. However, a corporation which has retired from its principal business is subject to the tax if, nevertheless, it engages in other business activities or maintains its organization for the purpose of continued effort in the pursuit of profit or gain."

This Article of the Regulations is drawn to conform to the holdings in a considerable line of cases to the effect that if the corporation is merely engaged in liquidating and distributing its assets and is not going after new business, it is not "carrying on or doing business within the meaning of the Internal Revenue Act."

The requirement of "doing business" appears in all capital stock tax statutes since the Act of August 5, 1909 known as "The Corporation Tax" law, 36 Stat. 11, 112, § 38. In that act the tax which was a gross income tax required payment of "a special excise tax with respect to the carrying on or doing business by such corporation * * *." The act was drawn to avoid the then constitutional prohibition against "Capitation, or other direct, tax * * * unless in Proportion to the Census * * *." Const. art. 1, § 9, cl. 4.

The 1909 Act was considered at great length in Flint v. Stone Tracy Co.[29]. The opinion in that case covered several appeals and with respect to some of them it was urged that the corporations were not "doing business." The court at page 171 of 220 U. S., at page 357 of 31 S.Ct., 55 L.Ed. 389, Ann.Cas.1912B, 1312, adopts Bouvier's [1 Bouvier's Law Dict., Rawles Third Rev., p. 406], definition of business, "that which occupies the time, attention, and labor of men for the purpose of a livelihood or profit." In all the cases before the court in that case, the activities were quite broad and the corporations were held taxable.

Another case argued and decided at the same time, but separately reported, is Zonne v. Minneapolis Syndicate[30], in which the taxpayer originally organized for the management of an office and store building, rented all its property to certain trustees for a term of 130 years. The charter was amended to limit the corporate activities to the holding of this property and collection of the rents. In holding the corporation not taxable Mr. Justice Day stated at page 189 of 220 U.S., at page 362 of 31 S.Ct., 55 L. Ed. 428 as follows:

"The corporation had practically gone out of business in connection with the property, and had disqualified itself by the terms of reorganization from any activity in respect to it. We are of opinion that the corporation was not doing business in such wise as to make it subject to the tax imposed by the act of 1909 (36 Stat. at L. 112, chap. 6, § 38, U.S.Comp.Stat.Supp.1909, p. 844)."

The rule laid down in the foregoing two cases was somewhat extended by McCoach v. Minehill & S. H. R. Co.[31] That case also arose under the 1909 act and involved a railroad which had prior to the taxable years entered into a 99-year lease with the Reading Railway Company. The Reading agreed to pay a fixed annual rental and maintain the roadbed. The taxpayer agreed to maintain its corporate existence and to do every act necessary to enable the Reading to enjoy the privileges of the lease. It appears that the taxpayer also received income from certain investments which were from time to time reinvested. The government urged that the retention of certain corporate powers, even though not exercised, brought it under the act. This contention was rejected by the Court in the following language at page 305 of 228 U.S., at page 423 of 33 S.Ct., 57 L.Ed. 842:

"It should be mentioned that there is nothing in the record to show that during the taxing years in question the company exercised its power of eminent domain, or put in force any other special corporate power, in aid of the business of the lessee. We therefore do not pass upon the question whether, if it should do so, it would be taxable under the act in question. We cannot, however, agree with the contention made in behalf of the government, that because the Minehill Company retains its franchise of corporate existence, maintains its organization, and holds itself ready to exercise its franchise of eminent domain, or other reserved powers, if and when required by the lessee, and ready to resume possession of the property at the expiration of the lease, it is therefore to be treated as doing business, in respect of the railroad, within the meaning of the corporation tax law."

---

[29] 1910, 220 U.S. 107, 31 S.Ct. 342, 55 L.Ed. 389, Ann.Cas.1912B, 1312.

[30] 1911, 220 U.S. 187, 31 S.Ct. 361, 55 L.Ed. 428.

[31] 1915, 228 U.S. 295, 33 S.Ct. 419, 57 L.Ed. 842.

The Supreme Court apparently placed considerable reliance upon the statute authorizing the lease. See page 304 of 228 U. S., page 423 of 33 S.Ct., 57 L.Ed. 842: "The effect of this legislation and of the lease made thereunder was to constitute the Reading Company the public agent for the operation of the railroad, and to prevent the Minehill Company from carrying on business in respect of the maintenance and operation of the railroad so long as the lease shall continue. And it is the Reading Company, and not the Minehill Company, that is 'doing business' as a railroad company upon the lines covered by the lease, and is taxable because of it."

In this respect the McCoach case is very similar to the instant one for the reason that the order of the Commissioner of Banking and Insurance and the plan of operation provided for therein have similarly disabled the taxpayer in this case from doing more than liquidating its present investments.

The foregoing three cases discussed by Justice Holmes in the United States v. Emery, Bird, Thayer Realty Co., [32] and the rule for determining whether a corporation is "doing business" or not is summed up as follows at pages 32, 33 of 237 U.S., at page 501 of 35 S.Ct., 59 L.Ed. 825:

"The question is rather what the corporation is doing than what it could do ([McCoach v. Minehill & S. H. R. Co.], 228 U.S. 305, 306 [33 S.Ct. 419, 57 L.Ed. 842]), but looking even to its powers they are limited very nearly to the necessary incidents of holding a specific tract of land. The possible sale of the whole would be merely the winding up of the corporation. That of a part would signify that the Dry Goods Company did not need it. The claimants' characteristic charter function, and the only one that it was carrying on, was the bare receipt and distribution to its stockholders of rent from a specified parcel of land."

The rule is more fully expounded by Justice Day in Von Baumbach v. Sargent Land Co. [33]: "It is evident, from what this court has said in dealing with the former cases, that the decision in each instance must depend upon the particular facts before the court. The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails, and doing only the acts necessary to continue that status, and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain, and such activities as are essential to those purposes."

The activities of the plaintiff in this case are confined solely to liquidating those investments which it now has and performing its obligations already undertaken. In no way can it enter into new business. Thus, under General Order No. 1 under which the company operated until July 1, 1935 (See Schedule R of Stipulation filed herein), the company was barred from:

(a) payment of principal or interest under its mortgage policy except to the extent actually collected from the underlying security, (paragraph 1 of said order);

(b) making sale of new mortgage policies (paragraph 3);

(c) substitution of collateral (paragraph 4);

(d) payment of dividends to stockholders (paragraph 5); and

(e) making of new mortgage loans (paragraph 6).

The company was further directed to do the following by the same order:

(a) reduce the overhead and operating expenses to the lowest practicable amounts (paragraph 7); and

(b) adopt a plan "to conserve the assets * * * and to secure ratable and equitable application thereof." (paragraph 8).

Pursuant to said General Order No. 1 the plaintiff adopted a plan of operation effective July 1, 1935 [34]. This plan, which ran until July 1, 1940, embodied all the restrictions and directions of General Order No. 1 with the exception of the fact that whether collected or not out of the underlying security, a policy or certificate holder was entitled to at least 3 per cent per annum. The taxpayer falls squarely within the rule set down in Von Baumbach v. Sargent Land Co., supra, and McCoach v. Minehill & S. H. R. Co., supra, namely, that it has reduced its activities to the owning and hold-

[32] 237 U.S. 28, 35 S.Ct. 499, 59 L. Ed. 825.

[33] 242 U.S. 503 at page 516, 37 S.Ct. 201, 204, 61 L.Ed. 460.

[34] Which is marked Schedule S annexed to the Stipulation.

ing of property and to the distribution of its avails and is doing only the acts necessary to continue that status. It has not maintained nor is it permitted to maintain an organization for the purpose of continued efforts in the pursuit of profit and gain.

The instant case is very close to Union Land & Timber Co. v. United States [35], in which a corporation sought refund of a capital stock tax. The corporation had been in that business for several years with the usual broad charter powers and its main business had been the acquisition of turpentine lands. The activities after liquidation were described as follows by the court:

"An office at Mobile, Ala., was continued by the president of the corporation, assisted by one stenographer, designated as secretary. All other officials were dispensed with; and sustained and continued efforts from that time on prevailed to realize the best possible price for the lands owned by the corporation. In the course of so dealing some turpentine leases, or rights to extract turpentine from turpentine trees, were let; and of course efforts were made to get the best possible price for the fee to the lands owned. If offers for the lands or turpentine rights were considered inadequate they were refused and more advanced prices sought. The progress of disposition has been tedious and delayed. To dispose advantageously for creditors of a large acreage of turpentine lands at a time when the markets were depressed and demand therefor seriously curtailed has involved years of time and effort, and though the majority of the lands and rights have been sold there still remain holdings undisposed of."

In finding for the plaintiff taxpayer the court stated as follows:

"A mere repetition of the application of the taxing act to varying conditions of fact, as reflected in numerous opinions of the courts, will serve no especial purpose. It is sufficient to observe that the issue is one of fact within the guiding principles of settled law. As said in the case of Von Baumbach v. Sargent Land Co., 242 U.S. 503, 516 [37 S.Ct. 201, 61 L.Ed. 460]: 'The fair test to be derived from a consideration of all of them is between a corporation which has reduced its activities to the owning and holding of property and the distribution of its avails and doing only the acts necessary to continue that status and one which is still active and is maintaining its organization for the purpose of continued efforts in the pursuit of profit and gain and such activities as are essential to those purposes.'

"We think this case comes squarely within the exception which exempts a liquidating corporation from the capital-stock tax. The defendant predicates a contrary opinion upon the fact that at times offers for lands were refused, and negotiations continued to obtain more; that turpentine rights were sometimes let, and finally that the inherent nature of the plaintiff's business was of necessity the doing of the very things it did do—i.e., buy and sell land and turpentine rights, etc., for profit. The charter rights of the corporation disclose its purposes, and among them was the purchase and sale of lands and turpentine rights; but the continuance of these activities as a going concern, promoted for the purpose of paying dividends to its stockholders, and doing the same things to acquire sufficient funds to pay creditors are distinctly different. One contemplates the present and the future, looks toward an indefinite continuance of business activities. The other is predicated in this case largely upon the misfortunes of the past, and looks exclusively to a disposition to the best advantage of what the corporation has and discontinuing business. No business enterprise could discontinue advantageously without putting forth its best efforts to realize the greatest possible sum for its assets, and the mere fact that in the course of such a proceeding profits may at times be realized, though in this case none are proven, does not designate the transaction as 'doing business' within the intent of the taxing act.

"The plaintiff has not acquired additional lands, it has not paid dividends to stockholders, and all it has done is to dispose, as rapidly as mature judgment and the state of the market would warrant, of all of its tangible investments. Judgment will be awarded the plaintiff. It is so ordered." [36]

The plaintiff during the years ending June 30, 1935, 1936, and 1937 [37] was liquidating its assets and distributing same

---

[35] 1928, 65 Ct.Cl. 129.

[36] See, also, Kingkade Hotel Co. v. Jones, D.C.W.D.Okl., 30 F.Supp. 508, appeal dismissed by stipulation, 10 Cir., 1939, 108 F.2d 1015; Sears v. Has-

sett, 1 Cir., 1940, 111 F.2d 961, and Nashua & L. R. Corporation v. Welch, D.C.Mass. 1940, 33 F.Supp. 684, affirmed per curiam, 1 Cir., 115 F.2d 920.

[37] The years within the period of limitation.

among those entitled thereto and it was not engaged in business and it was not subject to the capital stock tax levied and collected.

The defendant, William H. Kelly did not collect any of the taxes in dispute.

### Conclusions of Law.

1. Plaintiff has failed to sustain its burden of proving that it was entitled to have its income tax liability determined under the provisions of the federal revenue laws applicable to insurance companies.

2. Plaintiff was not carrying on or doing business after March 6, 1933, however, it did not include this ground in its claim for refund and said ground will only be allowed as to the years ending June 30, 1935, June 30, 1936, and June 30, 1937, the years within the period of limitation.

3. In view of the fact none of the payments, the recovery of which is sought herein, were made to former Collector of Internal Revenue, William H. Kelly, the suit is dismissed as to him.